HARRY MCMANN

*vs.*

RELIABLE FURNITURE CO.

Cumberland.   Opinion, April 1, 1958.

384

*Herbert H. Bennett,* for plaintiff.

*William B. Mahoney,*
*Francis C. Rocheleau,*
*James R. Desmond,*
*Bernstein & Bernstein,* for defendant.

SITTING: WILLIAMSON, C. J., WEBBER, TAPLEY, SULLIVAN, DUBORD, JJ. BELIVEAU, J., sat at argument but retired before the opinion was adopted.

SULLIVAN, J. The plaintiff was a pedestrian upon a public street. He was struck and injured by the defendant's truck. The jury awarded him a verdict.

During the trial the plaintiff offered some testimony of a physician. The evidence was admitted over the objection of the defendant which excepted.

At the close of all the evidence the defendant moved for a directed verdict upon the contention that all of the evidence considered most favorably to the plaintiff had not sustained the burden of the plaintiff to prove his due care but had, as a matter of law, established his contributory negligence. To a denial of such motion the defendant excepted.

A motion for a new trial was filed by the defendant for decision by this court. *Waye* v. *Decoster,* 140 Me. 192, 194.

The exceptions and motion are presented for determination.

The defendant concedes that the issue of the defendant's negligence was a question of fact for resolution by the jury.

The defendant attacks the verdict upon three particulars:

1. That the evidence plainly reveals the contributory negligence of the plaintiff;

2. That the damages awarded are excessive;

3. That in admitting certain evidence of the technique and details of a surgical operation performed upon the plaintiff whilst he was under a general anaesthetic the presiding justice erred and in so doing could only have aroused the sympathy of the jury to the prejudice of the defendant.

### 1. *Contributory Negligence.*

In considering this topic upon the motions of the defendant the legal principles are axiomatic.

> "It is well settled that a verdict should not be ordered for the defendant by the Trial Court when, taking the most favorable view of the plaintiff's evidence, including every justifiable inference, different conclusions may be fairly drawn from the evidence by different minds. Collins v. Wellman, 129 Me., 263, 151 A., 422; Young v. Chandler, 102 Me., 251, 66 A., 539."

> *Howe* v. *Houde,* 137 Me., 119.

> In considering the motion we will apply the familiar rules that the evidence with all proper inferences drawn therefrom is to be taken in the light most favorable to the jury's findings and that the verdict stands unless manifestly wrong. Morneault v. Inh. of Town of Hampden, 145 Me. 212, 74 A. (2nd) 455; and Lessard v. Samuel Sherman Corporation, 145 Me. 296, 75 A. (2nd) 425

> *Bragdon* v. *Shapiro,* 146 Me. 83, 84.

From the testimony the jury could have distilled the facts now narrated.

Congress Street in Portland runs east and west and intersects Pearl Street which courses north and south. Congress Street roadway is 47 feet wide and Pearl Street, 34 feet wide. There are 4 outlined crosswalks. At each of the 4 corners is a traffic light. Lights serving Congress Street traffic are green for 38 seconds, yellow or amber for 3 seconds and red for 26 seconds plus an additional 3 seconds. Complementarily, lights serving Pearl Street traffic are red

for 38 seconds plus 3 more seconds, green for 26 seconds and yellow for 3 seconds. At no time are a red and yellow light illuminated simultaneously. There is no pedestrian interval afforded at this intersection. Therefore, vehicular traffic is never stopped contemporaneously by the lights in both east-west and north-south directions.

On the afternoon of May 7, A. D. 1955 the day was clear and the streets dry. The plaintiff stood on the sidewalk at the northwest corner of the intersection facing a red light at the southwest corner. Immediately to his left, facing south was a stopped car. At the southeast corner facing north was a halted car known as the Harmon car but the plaintiff does not remember seeing the defendant's truck. The light at the southwest corner changed to green. The plaintiff looked up and down Congress Street. He saw one stationary car on Congress Street, headed west at the northeast corner. He stepped down upon the crosswalk and started to pass southerly. The car to his left started. Plaintiff looked at it and watched to see if its directional lights were flashing. They were not and the car proved to be proceeding southerly. Plaintiff did not stop walking. The car last noted passed the plaintiff completely about the middle of the intersection. Plaintiff heard the Harmon car at the southeast corner and glanced to his left to see it advance northerly across the intersection. The driver of that car had not responded at once to the green light facing him and had been nudged to attention by the passenger with him. The plaintiff turned his eyes to the front and the car which had just passed him upon his left, going south, loomed in his vision. He gazed to his right and west. No traffic was on Congress Street from that direction. He directed his attention ahead once more and beheld the defendant truck just as it struck him at a spot about 4 feet from the southwest corner of the intersection. He was thrown to the ground upon the crosswalk. The truck stopped immediately, 3 or 4 feet from the curbing at the southwest corner, in a

position pointing west. The left hip of the plaintiff was fractured by the impact of the truck.

The plaintiff was hit just before the Harmon car reached the center of the intersection.

The defendant truck was of the furniture, moving van type, some 9 or 10 feet high, 15 to 17 feet long and 12 to 14 feet wide. It was yellow with black letters outlined in silver.

No traffic officer was functioning at the intersection. The defendant's truck driver did not sound his horn before the accident.

The plaintiff did not recall having seen the defendant's truck until it was upon him. There was testimony that the truck had stopped behind the Harmon car at the southeast corner before the change in the traffic lights.

Admitted in evidence was the following portion of a traffic ordinance of the City of Portland, in effect at the time of the accident:

"Article VI

- - - - - - - - - - - - - - - - - - - - -

Sec. 66.   Crossing at other than crosswalks.

- - - - - - - - - - - - - - - - - - - - -

(b)   On the following streets or parts of streets it shall be unlawful and a violation of the provisions of this ordinance for a pedestrian to cross said streets at any place except within a crosswalk:

- - - - - - - - - - - - - - - - - - - - -

CONGRESS STREET — State Street to Washington Avenue

- - - - - - - - - - - - - - - - - - - - -

The provisions of this subsection apply to both sides of the intersection of the limiting streets.

(c)   A pedestrian starting to cross a street in any crosswalk in the City of Portland on a green or 'Go' signal sign, or where a red and yellow

'Pedestrian Interval' signal is provided, or where a police officer or fireman is directing traffic, shall have the right-of-way over all vehicles, including those making turns, until such pedestrian has reached the opposite curb. It shall be unlawful and a violation of the provisions of this ordinance for the operator of any vehicle to fail to yield the right-of-way to any pedestrian who is crossing a street as herein provided.

- - - - - - - - - - - - - - - - - - - - - - -

Notwithstanding the provisions of this section, every driver of a vehicle shall exercise due care to avoid colliding with any pedestrian upon any roadway, and shall give warning by sounding the horn when necessary, and shall exercise proper precaution upon observing any child or any confused or incapacitated person upon a roadway."

See R. S. (1954) c. 91, § 86, VI, X.

R. S. (1954) c. 22, § 87 is as follows:

"Whenever traffic is controlled by traffic-control signals exhibiting the words 'Go,' 'Caution' or 'Stop,' or exhibiting different colored lights successively one at a itme, or in combination, or with arrows, the following colors only shall be used and said terms and lights shall indicate and apply to drivers of vehicles and pedestrians as follows:
1 Green alone or 'Go'

A. Vehicular traffic facing the signal may proceed straight through or turn right or left unless a sign at such place prohibits either such turn; but vehicular traffic shall yield the right of way to other vehicles and to pedestrians lawfully within the intersection at the time such signal is exhibited.

B. Pedestrians facing the signal may proceed across the roadway within any crosswalk."

Defendant contends that the facts arrayed and susceptible to jury finding and the law quoted confirm the contributory negligence of the plaintiff as a matter of law. The plaintiff

did not remember seeing the defendant's truck until the collision. The defendant insists that it was legally obligatory for the plaintiff to have looked in the direction of that large, conspicuous vehicle, and to have noticed it and that the failure to have done so was a proximate cause of plaintiff's misfortune.

"Mere looking is not sufficient. One is bound to see what is obviously to be seen."

*Martin* v. *Atherton,* 151 Me. 108, 110.

Plaintiff at his trial had the burden of proving his own due care under the circumstances in which he found himself just prior to his injury. The defendant must now, after verdict, demonstrate that the plaintiff did not exercise such care and that reasonable minds could not differ in concluding that he did not.

The evidence depicts the plaintiff as a pedestrian normally preoccupied with his own safety from the time of his station on the northwest corner of the intersection until the serious mishap. His testimony accounts for each instant with some vigilance of the moment. He was wary at all times but the sufficiency of his attention and his heedfulness to his observations are severely impugned by the defense. The defendant is insistent that the failure of the plaintiff to prove that he noticed the colorful bulk of the defendant's truck and alerted himself to its movement was legally culpable and insuperable.

As the plaintiff started with the stir of traffic he was abreast of one car to the middle of the intersection where it outstripped him and went southerly. The Harmon car waiting at the southeast corner was sluggish and responded to the light only after some lapse. Plaintiff's attention was caught by the noise of the latter car. Potentially the Harmon car was in a position to execute a left turn in the direction of plaintiff's crosswalk. As the Harmon car eliminated

itself as a possible hazard by holding to a northerly course the plaintiff drew back his gaze to see the first car which had accompanied his across the intersection continuing toward or in Pearl Street. He gazed west to anticipate exposure from any chance, non-conforming Congress Street traffic. When he faced front once more the defendant's truck came at him. Defendant's driver had not sounded his horn. Plaintiff had then traversed all but some 4 feet of the 47 foot crosswalk.

As the plaintiff traversed his crosswalk he was legally fortified with the assumption that all vehicles would obey the city ordinance and the state statute. *Day* v. *Cunningham,* 125 Me. 328, 333; *Ross* v. *Russell,* 142 Me. 101, 105. That was something palpable although it was not intended by the law to be perverted by the plaintiff into false security or rash presumption. It did affect reasonable foreseeability somewhat for the plaintiff. Plaintiff was at the last 1/12th of the distance to safety when hurt. In his conduct in the presence of moving variants and variables at that activated intersection was he remiss in not detecting so near the opposite curbing what proved to be the real menace? Were his efforts at vigilance sensible and intelligent to a reasonable degree? Did he observe all that was reasonably imminent? Should he also have noticed the truck and followed its operation to the possible neglect of objects more immediate? Was the behavior of the defendant's driver occasioned by the inertia of the Harmon car which may have provoked the truck driver into cutting a sharp corner? In the existing choices of movements for drivers of vehicles was such a one to have been then and there fairly apprehended by the plaintiff? What effect upon any judgment of the plaintiff's behavior must be given to the failure of the truck driver to sound his horn? As a matter of law was the plaintiff negligent? We do not believe so. We cannot say that there was not a jury question presented or that the jury who

viewed the locale of the collision and heard the testimony were not supported in their findings.

## 2. *Damages.*

The jury verdict was $65,650 and defendant vigorously protests that it is excessive.

Damage assessment is the sole province of the jury and the amount fixed must stand unless it can be demonstrated that "the jury acted under some bias, prejudice or improper influence, or have made some mistake of fact or law." *Cayford* v. *Wilbur*, 86 Me. 414, 416.

The computation of damages is just as difficult as it is indispensable in our administration of justice. Ponderables, probabilities, intangibles, variables and concrete sums are added and subtracted and must be placed on one side of an equation upon the other side of which is a liquidated amount of money. No science could be more practical and inexact. None is more necessary. There are certain fixed principles but the facts of cases differ so as to make few, comparable precedents. Translating pain and suffering, past and future, into terms of money compensation is but an example of the incongruous tasks of the jury. In the natural light of reason conservative commitments must be made for an unknowable future. There are few absolutes available. Considering the problems encountered the doctrine has in practice been reasonably satisfactory. No other has survived empirical probation.

The amount awarded the plaintiff was objectively large.

"- - - - - It is not for the reviewing court to interfere merely because the award is large, or because the court would have awarded less. Unless a verdict very clearly appears to be excessive, upon any view of the facts which the jury are authorized to adopt, it will not be disturbed. - - - - -"

*Baston* v. *Thombs*, 127 Me. 278, 281.

Credible testimony related in detail to the jury, the plaintiff's severe injuries, his long, protracted period of pain and suffering, his heavy expenses, financial loss and permanent disability. Plaintiff was injured on May 7, A. D. 1955. He submitted to 6 necessary, major operations spanning a period of 20 months. The diagnosis was a severe, comminuted fracture of the left femur, inter and sub-trochanteric, with several loose bone fragments. Osteomyelitis or infection of the bone resulted. There are a sequel and wake of hip and knee impairments.

The first operation on May 8, 1955 was an affair of 3 hours under a general anaesthetic, to reduce the fracture by traction and by means of a long incision to affix a metal plate. On June 2, 1955 there followed a second operation since by that time infection of the bone had been corroborated. The wound was drained and bone chips were removed. On July 7, 1955 was had a third operation. Infection had extended the length of the metal blade on the outer surface. The bone was scraped. A drain was left in the wound. On December 28, 1955 a fourth operation was performed and the metal plate was removed with more bone scraping. The fracture had healed but the efflux continued. The fifth operation occurred on February 14, 1956. There was more leakage. The wound was packed open. On January 8, 1957 was the sixth and last operation. Two fragments of dead bone were removed and the wound was again packed open.

The infection necessitated many blood transfusions. Plaintiff was catheterized.

During a period of 23 months, with the exception of 8 weeks, the operative wounds were draining. Plaintiff was hospitalized for some 10 months and during much of such time was in complete bodily constraint as to mobility. He developed back sores. When activity became possible he was obliged to use crutches for some time until ultimately a cane

became adequate. At the time of the trial he required the aid of a cane for walking.

The physical pain and suffering of the plaintiff described by witnesses was persistent and extremely intense at recurring intervals through many months. The pus excretions from the infected bone were denominated as odorous and revolting. A major ordeal of the plaintiff was thus described by a specialist, physician witness:

> "Osteomyelitis in its acute stage is no different, except it is located in bone, from a boil, a deep boil."

The first few dressings during the periods when the wound was permitted to remain open were characterized by one of the surgeons as extremely painful.

The mental suffering of the plaintiff by inference was necessarily excessive.

The osteomyelitis which became chronic is in the judgment of three specialists arrested but not for a surety cured. The medical opinion was in accord that the condition can be reactivated by trauma or external force of no great magnitude and differed as to whether spontaneously it is possible or probable that such condition will revive. The progressive passage of time without recurrence of the inflammation was deemed to be definitely in favor of the plaintiff against a revisitation.

The left hip of the plaintiff is impaired. His left knee is very unstable. It is classified expertly as a "20 degree knock-knee" liable to go out from under the patient during some activities. Future surgery is indicated entailing 3 or 4 months hospitalization, the wearing of a cast for 6 or 8 weeks and convalescence for 4 to 6 months. The prospect of success from such surgery was estimated by an orthopedist as only a "fifty-fifty chance."

On May 7, A. D. 1955 plaintiff was 48 years old and possessed a life expectancy of 24.52 years. He had progressed through the third grade at school in his formal education. He had been a laborer by occupation and a steady worker. His health had been sound. His average yearly earnings could be accepted as $4,000. His future earning capacity was predicted by a medical expert from whose examination are quoted these colloques:

"Q. You don't think he will ever do any heavy construction, either?

A. No, sir.

Q. Do you think he could do some light work?

A. Yes.

Q. Such as what? What would be the nature of the work he could do, assuming he could find it, Doctor?

A. He could have a job sitting at the entrance of a quarry, checking trucks as they went by, taking numbers on trucks. Under certain circumstances I am sure he could run an elevator - - - He might perform a job which he does with his hands if he had an opportunity of changing positions. I think he would tend to get stiff and sore and aching in one standing position. If he had a chance to move about a bit occasionally and do most of the work with his hands. I think he could perform that occupation. I don't know specifically just what job that might be.

Q. Could he work in an elevator in which there is no seat?

A. I think that is a difficult question to answer because it depends a great deal upon the amount of discomfort and pain as well as the willpower of the person. Some people in Mr. McMann's condition, if that were the only job available for them they would do it, and have to spend the rest of the time in bed, and others

just couldn't do it. You get into psychological questions there."

The jury may well have concluded that wages for such work as the plaintiff may in the future secure and perform would be meager.

The jury were mindful that the plaintiff could have but one verdict for all past and future damages. The purchasing power of money at the time of the trial was less than it had been when cases of other years had been decided. The medical expenses were $7347.49.

A graph such as the following, of synthetic elements which are warranted and justified by the evidence would vindicate the verdict of the jury as one "within reasonable limits based upon the testimony." *Savoy* v. *McLeod*, 111 Me. 234, 238.

| | |
|---|---:|
| Medical expenses, pre-writ, | 7347.49 |
| Pre-writ loss in earning capacity, | 8455.56 |
| Other, future medical expenses, | ? |
| Loss in future earning capacity, 22 years @ $2000 annually; present value @ 3% rate, savings bank schedule | 32830.00 |
| Future operation on knee ($1000); extra loss of earning capacity involved, ($1000), | 2000.00 |
| Pain and suffering, past and future, | 15016.95 |
| | $65650.00 |

The review of the facts which the jury was authorized to adopt fails to make the verdict appear clearly excessive. *Baston* v. *Thombs*, 127 Me. 278, 281.

3. *Exceptions to evidence.*

An orthopedic surgeon testified at the call of the plaintiff concerning the performance by that witness of the first operation upon the plaintiff. This doctor had utilized a Blount blade plate of metal to affix the broken bone in staid

alignment and thus reinforce the knitting process. An "exact replica" of the Blount blade plate was exhibited in court and identified by the witness. Defendant resisted the "unnecessary detail" of what was done but not the results.

The doctor explained:

"I stated only that I think it '(the plate)' is material in that this particular wound became infected and it required a couple of other operations, one in particular which consisted of removing this metal. In that respect, it is the only respect that I know of - - - - it required another operation and this may have contributed to the infection."

The record of the trial then continues:

"Q.  Will you go on, Doctor, and explain the operation to us, the first operation?
A.  The Blount blade plate is placed along the - - -

(Defense Counsel) May I object again to this detail?  I am sorry to interrupt but I have got to protect my rights.

THE COURT:  He may answer that question and your exception will be noted.

Doctor, please do it very objectively.

A.  The Blount blade plate is placed on the drill wire in order to get it in the right direction. When it is in there it is held with one screw, as you see in the x-ray and a picture is taken to be sure it is in the right position. Nine screws are added to the plate. We added a little extra bone because these fractures are a little slow to heal, and with several more sutures we closed the wound and put him back to bed.

Q.  How is the plate put into the bone?
A.  By hammer.

(Defense Counsel):  I object.

THE COURT: He may answer. Exception will be noted.

A. By hammer, and a holder that goes onto the blade plate.

Q. How are screws attached to the bone?

(Defense Counsel): Objection.

THE COURT: Admitted: Exception noted.

A. With a screw driver.

Q. With a screw driver?
A. Yes."

The objections of the defendant were that evidence was thus admitted which was not material or pertinent to the issue of the trial and which was highly prejudicial to the rights of the defendant.

The replica of the Blount blade plate was not offered or admitted in evidence and is not before this court. The plate used appears in an x-ray exhibit but not very comprehensively.

Later in the trial the same surgeon in relating the events of the fourth operation of December 28, 1955 testified:

"Q. What was your diagnosis when he came back at that time, Doctor?

A. Osteomyelitis.

Q. Will you explain to us what osteomyelitis is?
A. Infection of bone. - - - Itis means infection and osteo - - means bone.

It is bone infection. Bugs and so forth get into the bone tissue, itself. It is a little harder to heal up bone infection than it is ordinary infection of the skin because the organisms get into the bone.

THE COURT: Doctor, as a result of this diagnosis, what did you then do?

A. We felt that the metal might have been contributing to the infection and we therefore opened up the wound and removed the metal and the band and the screws and again scraped underneath the plate. He had been draining during this period and that is the reason why we felt that we should operate a fourth time. By that time we felt the fracture was healed and that is the reason why we waited until that length of time. Earlier we would have taken the metal out if we had felt that the fracture was healed, but it had not."

In view of the statements of this expert witness the Blount blade plate, its "exact replica" and the technique of its affixation were conceivably applicable to issues in the case — the injuries to the plaintiff, their chain of causality, their extent, the drastic nature of the operations occasioned, their aftermath and any subsequent, conscious suffering of the patient. The metal plate was regarded as having contributed to the infection. We are not told how precisely it could have done so. Nor are we enlightened as to whether or not it was necessary to recite such details as the use of screws, hammer and screw driver in order to account fully for the genesis and the development of that infection. It was not explained if the use of screws, hammer or screw driver disposed the bone to infection or subserved infection more than non-usage or whether such usage affected later conscious suffering. The evidence disputed was arguably both relevant and material, as the record stands. *Torrey* v. *Congress Square Hotel Co.,* 145 Me. 234, 240.

"- - - - - The determination of relevancy and materiality rests largely in the discretion of the presiding justice. - - - - -"

*State* v. *Hume,* 146 Me. 129, 140.

"- - - - - It will be presumed that the ruling of a Judge, receiving or rejecting evidence, was right,

unless the exceptions show affirmatively it was wrong - - - - -"

*Sweeney* v. *Cumberland County Power & Light Co.,* 114 Me. 367, 371.

"It is a matter of very little consequence whether a reason assigned by a Judge at nisi pruis for his ruling is or not technically accurate and sound. Doubtless what may be denominated a sound legal instinct produces many correct results upon the admissibility of testimony when the Judge who made them might not be ready to state the true reason with precision or even with a perfect comprehension of the proper grounds upon which the admission or exclusion should be placed. The question before us is not whether the presiding Justice placed the admission of the testimony upon exactly the true ground but whether or not it is competent testimony." State v. Wagner, 61 Me. 178.

*State* v. *Mosley,* 133 Me. 168, 173.

The defense protests further that such evidence admitted over its objections was highly prejudicial to the rights of the defendant and subjected the jury to gruesome but superfluous details which were calculated to and did inculcate bias, sympathy and prejudice. We have stated earlier in this opinion our considered judgment that the verdict was within justifiable bounds as to damages awarded and in that respect at least was not a result of inflamed will rather than reason.

The admission or exclusion of the challenged evidence was a subject for the sound discretion of the presiding justice.

In *Jameson* v. *Weld,* 93 Me. 345, 354 the plaintiff at the trial had been permitted over the objection of the defendant in a malpractice suit to exhibit her injured arm to the jury. This court said:

"- - - - - The present condition of the arm is claimed by the plaintiff to have been the consequence of the

defendant's want of skill and care. Such is the effect of her evidence. This is denied by the defandant. - - - - - In the view of the plaintiff's contention ant evidence, we think it was clearly within the discretion of the court to permit the arm to be shown to the jury."

In *Rogers* v. *Rogers*, 80 N. H. 96, 97 the rule is thus stated:

"- - - - - In other words, the plaintiffs invoke the undue prejudice rule. 3 Wig. Ev., c. 1904. This rule excludes relevant facts whenever it appears that the prejudice they would excite will be so great that it is probable they will mislead the trier. State v. Lapage, 57 N. H. 245.

In short, such facts are excluded, not because they have no tendency to prove the matter in issue, but because they have too great a tendency to prove it. 1 Wig. Ev. 55 - 57.

The test therefore to determine the admissibility of relevant facts capable of exciting prejudice is to inquire whether the prejudice they will excite will be so great as to overbalance any assistance they may be to the trier. - - - - - While it can be said that these letters were capable of exciting prejudice, it cannot be said that their capacity for exciting it is so great that it is probable they misled the master. In other words, notwithstanding the letters might have been excluded under the undue prejudice rule, it cannot be said that the master erred when he admitted them."

The disputed evidence was in part, to be sure, unalloyed realism but the injuries to the plaintiff in this case were generally of such gravity that by their very nature and even when less graphically described they would have been capable of shocking lay sensibilities. The plaintiff was warranted in proving his case by the clearest evidence subject only to the duty of the presiding justice to prevent

abuse. The case may be close but we are not satisfied of a demonstrated misuse of judicial discrimination.

The entries must be:

> *Exceptions overruled.*
>
> *Motion denied.*