Arthur COPE

v.

Ronnie SEVIGNY d/b/a Ronnie's Cleaning Service.

Supreme Judicial Court of Maine.

April 4, 1972.

**684**

Plaintiff has appealed to this Court from the judgment. He claims reversible error in three basic aspects: (1) the refusal of the presiding Justice to grant the motion for a new trial (or "additur"); (2) various evidentiary rulings by the presiding Justice; and (3) the denial by the presiding Justice of plaintiff's motion for a mistrial made after incidents had occurred relating to a "Thomas Collar", so-called, and described in some of the evidence to have been worn by plaintiff in connection with his injuries.

*The Denial of the Motion for a New Trial (or "additur")*

■ To sustain his claim of reversible error in the denial of the motion for new trial for inadequacy of damages plaintiff must establish that, the evidence being considered in the light most favorably in support of the verdict of the jury, Thompson v. Johnson, Me., 270 A.2d 879 (1970), the award is without rational explanation and, hence, is to be deemed a disregard by the jury of the evidence or the result of passion, bias, prejudice, accident, mistake or improper compromise. Conroy v. Reid, 132 Me. 162, 168 A. 215 (1933); Johnson et al. v. Kreuzer, 147 Me. 206, 85 A.2d 179 (1951); Bergeron v. Allard, 152 Me. 297, 128 A.2d 848 (1957); Thompson v. Johnson, supra.

The jury was here concerned with an injury to plaintiff in the form of a neck strain, commonly known as a "whiplash" type injury. It was caused by a sudden impact against the stopped automobile in which plaintiff was sitting when it was forcibly struck from the rear by another automobile.

The evidence discloses that plaintiff was entitled to medical expenses (including fees of physicians, diagnostic charges for x-rays and the like and the costs of pharmaceutical supplies and diathermy treatments) within a range deemed reasonable by the jury to a maximum of $1,076.70.

Julian G. Hubbard, Seymour Nathanson, Portland, for plaintiff.

Mahoney, Desmond, Robinson & Mahoney, by Lawrence P. Mahoney, Portland, for defendant.

Before DUFRESNE, C. J., and WEBBER, WEATHERBEE, POMEROY, WERNICK and ARCHIBALD, JJ.

WERNICK, Justice.

In this civil action, seeking damages for injuries alleged to have been sustained as the result of a collision between motor vehicles, a jury trial was held. The legal liability of the defendant was admitted and the only issue for jury determination was the amount of damages to be assessed.

The jury returned a verdict of $2,632.95, an amount deemed by plaintiff to be inadequate. Plaintiff, therefore, moved before the presiding Justice for a new trial, defendant first to be afforded "opportunity to accept an addition to the verdict of such amount as the court judges to be reasonable" (an "additur"). Rule 59(a) M.R. C.P. The presiding Justice denied the motion. Judgment for the plaintiff was entered upon the verdict of the jury.

In addition to these special damages, plaintiff had claimed other special damages to compensate him for an impaired work capacity which plaintiff maintains had resulted, prior to the time of trial, in an actual loss of earnings. Plaintiff gave his own estimate of the dollar value of that impairment as the equivalent of approximately $150.00 per week for the period from January 30, 1967, the date of the collision, to December 16, 1969 (the first day of trial). He further contended that the diminished incapacity to work would continue into the indefinite future.

Confronted with an apparent discrepancy between his claim of actual loss of earnings and the fact that he had continued to receive the same amount of salary as had been paid to him prior to his injury (approximately $450.00 per week), plaintiff offered the explanation that (1) he was in fact absent from work on an average of approximately 1½ hours per day, (2) when he was at work his work efficiency was reduced, and (3) his employer, a closed corporation owned in equal shares by three brothers one of whom was the plaintiff, was advancing to plaintiff as a loan the difference between his true work value to the employer ($300.00) and his prior salary ($450.00), plaintiff being "impliedly obligated" to repay the moneys thus advanced.

No other witnesses testified, however, either as to an actual substantial loss of time by plaintiff from his work or in corroboration of the "loan" arrangement.

Furthermore, the physicians who testified offered no opinions which related directly and explicitly to the impairment of plaintiff's ability to work. They offered evidence only of plaintiff's physical condition—i. e., motion limitations of the neck, muscle spasm and tenderness elicited from plaintiff (the last of these being a subjective response to specific types of palpation) all indicative of the existence, generally, of neck discomfort, and which might (and which plaintiff reported did) appear in varying degrees of intensity and periods of recurrence bearing a partial relationship to physical activity and nervous stress. The physicians failed, however, to state a correlation, if any, between these circumstances of plaintiff's physical condition and plaintiff's general ability, or inability, to perform the usual duties of his occupation.

With the evidence in this posture, it was uniquely for the jury to assess the credibility of the plaintiff and the weight to be given to his fundamentally uncorroborated description of his actual loss of time from work as well as the impairment in his work efficiency while he was at work—and as claimed by the plaintiff to have been caused by his injury. Especially if the jury was unwilling to give credence to the plaintiff's claim of a "loan" arrangement, the jury was free to consider all of the testimony of plaintiff bearing upon his alleged loss of time and earnings and impaired capacity to work in the future as largely suspect and to be disregarded.

■ Under the principle that all rational intendments are to be taken in support of the jury verdict, the jury is deemed by us (in our assessment of the propriety of the denial of a motion for new trial for inadequate damages) to have found in fact that which was open to the jury rationally to determine. We proceed, therefore, on the premise that the jury decided that the plaintiff had sustained no (or insignificant) impairment of his capacity, or power, to perform the work incident to his usual occupation and, therefore, no (or insignificant) loss of time and earnings attributable to his injury.

On this basis, it becomes clear that in addition to the maximum of approximately $1,076.70 "specials" (for medical expenses) the total verdict of the jury (in the amount of $2,632.95) includes an award to the plaintiff for his pain and suffering, at minimum, of $1,556.25.

■ From the totality of the evidence we cannot say that such damages for pain

and suffering are without rational foundation.

The jury was within its prerogative to evaluate the plaintiff's own testimony as to his pain and suffering in terms of the jury's general assessment of plaintiff's credibility. A conclusion by the jury (validly open to it, as we have already decided) that the plaintiff had continued to receive full pay because plaintiff, despite his injury, was in fact able to work, and did work, in manner and effectiveness substantially as before he sustained injury would support the further conclusion that plaintiff's pain and suffering was in fact markedly less severe than plaintiff had described it in his testimony.

The testimony of the physicians was reasonably consistent with such conclusion by the jury. A neurologist who examined plaintiff approximately two weeks after plaintiff had been injured testified that his examination revealed a fundamentally normal neurological picture. As an objective sign, he found some spasm localized in the trapezius muscle. He testified that plaintiff gave subjective complaints of tenderness in response to the application of pressure in the neck area just beneath the skull. The neurologist prescribed no treatment for plaintiff as the result of his examination.

A general practitioner, with considerable practicing experience in the field of industrial injuries, examined plaintiff, for the first time, approximately six weeks after the collision had occurred. He then found, as the only objective signs, spasm in the muscles controlling movements of the head and some limitations of neck motion. These objective signs were accompanied by plaintiff's subjective statements of pain in response to palpation at the base of the neck, and the pain was described as radiating, with lesser intensity, into laterally adjacent areas.

The diagnosis was a "whiplash" injury, taking the form of an acute strain of the ligaments and muscles of the cervical spine. Diathermy was prescribed, and muscle relaxants, as well as the gradual elimination of the "Thomas collar" which plaintiff was already wearing when he first came to the general practitioner.

Subsequently, this physician saw plaintiff during a period of approximately one year and nine months. The evidence is unclear as to the frequency of the visits, indicating only that during approximately the first four months, there were many diathermy treatments and, thereafter, the visits gradually kept "getting further apart" until during the last six months they were approximately once a month. The general practitioner testified that after the first few visits the "gist" of the examinations made by him was that he would discuss with plaintiff his complaints and he would palpate the neck of plaintiff to see if he could elicit responses from plaintiff indicative of tender areas. While the testimony of the general practitioner describes subjective complaints by the plaintiff of tenderness or discomfort localized between the sixth and seventh cervical vertebrae as persisting over a long period, objective signs of injury are mentioned as having been found only at the first examination approximately six weeks after the injury to plaintiff was sustained; no other indication of the presence of objective signs at any subsequent examination appears in the testimony of the general practitioner.

An orthopedic specialist examined the plaintiff approximately one year after plaintiff had sustained injury. At that time he found an absence of objective signs of injury. Subjective complaints of tenderness were elicited from the plaintiff when pressure was applied with a finger or thumb to the region at the base of the neck as well as when applied on the top of plaintiff's head as the head was tilted backward and to the left side.

From such testimony of the physicians the jury would have been justified in concluding that the objective signs of a continuing injury to plaintiff had terminated within two months after the injury had

been sustained; and that, thereafter, the indications of the persistence of injury accompanied by pain and discomfort were entirely subjective, ascertainable only by statements by the plaintiff.

■ As to these subjective complaints, the jury was free to give them such weight as the jury deemed them to deserve, especially in light of the jury's evaluation of the general credibility of the plaintiff. If, as previously indicated, the jury had arrived at a general conclusion (properly open) that plaintiff in his testimony to the jury had heavily exaggerated his pain and suffering, the jury would have been within legitimate bounds had it further determined that plaintiff had likewise overstated his symptoms of pain and tenderness to the physicians.

The amount of damages awarded, when the evidence is taken most favorably to support the verdict, is thus capable of explanation consistent with rationality.

The motion for a new trial (or "additur") was correctly denied by the presiding Justice.

### The Rulings on Evidence

One of the doctors who had treated plaintiff had brought with him to court, to assist him in his testimony, a summary report which had been secondarily prepared by him from his original office records of plaintiff's case. During the doctor's testimony on direct examination in behalf of the plaintiff, counsel for the defendant objected on two occasions (closely repeated in time) that the doctor was reading the report into evidence rather than stating his own present recollection. Apparently recognizing the factual correctness of defense counsel's statements, the presiding Justice told the doctor to reread the report to himself, thereby to refresh his present memory. He then required the doctor to surrender possession of the report. Simultaneously, however, the presiding Justice made explicitly clear that if,

at any time, the doctor found his present memory inadequate, opportunity would be afforded him to have his original office records brought into court for appropriate use.

Counsel for the plaintiff objected to these actions of the presiding Justice and specifically to the "Court's taking the medical record of the doctor from his possession". Plaintiff now presses this point on appeal as reversible error.

■ The total record establishes that plaintiff can take nothing from this claim. The record discloses that the presiding Justice recognized, correctly, that, generally, a witness may revive his memory and achieve a present recollection from any type of writing (or other article) which might tend to serve the purpose; in this respect, the best evidence rule is without applicability. Pierce v. Bangor & Aroostook Railroad Company, 94 Me. 171, 47 A. 144 (1900); 3 Wigmore, Evidence, (Chadbourn rev. 1970) § 760.

■ Simultaneously, however, the presiding Justice perceived, again correctly, that when a witness is unable to achieve a present memory (efforts to revive it having been exhausted), the contents of a document may be utilized as evidence of independent matters in issue to which the contents relate (either in the form that the contents of the document are read verbatim into evidence or the document itself is introduced as an exhibit), if specific circumstances are shown. The contents of the document may properly become evidence if the witness states as his *present memory* that: (1) the contents of the document are a record of matters in fact previously known to, and remembered by, him; (2) the record had been previously made, or seen, by him, Willey v. Maine Central Railroad Company, 137 Me. 223, 18 A.2d 316 (1941), at a time when his memory of the matters was *then* fresh (the time when the record was made, or seen—as contemporaneous with or shortly after the occurrence of the events—being important

corroborative evidence of the freshness of memory but not itself an independently necessary element, or criterion, of admissibility); and (3) at that past time the record was *then* remembered to be an accurate record of the matters described, Willey v. Maine Central Railroad Company, supra. See: Chamberlain v. Sands, et al, 27 Me. 458, 466 (1847).

This is the principle often identified by the shorthand designation "past recollection recorded". 3 Wigmore, Evidence, (Chadbourn rev. 1970) § 734 et seq.

■ Past recollection recorded, however, as the presiding Justice properly held, is admissible as evidence subject to the overall independently controlling requirements of the best evidence rule,[1] Jewett v. United States, 15 F.2d 955 (9th Cir. 1926); Clark v. Holmes, 71 Conn. 749, 43 A. 194 (1899); Peoples National Bank v. Manos Bros. Inc., 226 S.C. 257, 84 S.E.2d 857, 45 A.L.R.2d 1070 (1954); 3 Wigmore, Evidence, (Chadbourn rev. 1970) § 749;— the best evidence rule being a fundamental general evidentiary principle operative whenever the contents of a writing are utilized as evidence of independent matters at issue. 4 Wigmore, Evidence, 3d ed. 1940, § 1179; 29 Am.Jur.2d, Evidence, § 448, p. 508 (as shown by appropriate cases appearing in n. 5).

■ In the present situation the presiding Justice sought to avoid the danger that the doctor, inadvertently, would continue to read the contents of the secondary report, verbatim, into evidence and would thereby be introducing into evidence past recollection recorded in violation of the best evidence rule (the original office records being available to be produced). The presiding Justice properly exercised his discretion, therefore, to ensure that the doctor would either testify to his "present recollection revived" or be obliged to produce his original office records to be offered into evidence as his "past recollection recorded" (if his present recollection were to be found incapable of revival) and in full compliance with the best evidence rule.

■ Further, the record clearly reveals that plaintiff suffered no prejudice from the actions of the presiding Justice. The doctor subsequently encountered no difficulties, even though he had been deprived of possession of his secondary report, in answering on the basis of present recollection all questions asked of him. At no time did he suggest a need to use his report to assist him in refreshing his present memory, and his present memory never faltered while he testified on direct and cross examination.

---

1. In Pierce v. Bangor & Aroostook Railroad Company, supra, the Court expressed a dictum regarding past recollection recorded (p. 177). In *Pierce* the plaintiff sought to recover damages for the destruction by fire of a quantity of ship-knees. In the course of proving his damages plaintiff testified that a few days before the fire he had taken an account of his ship-knees and had made record of the account upon a "shingle". Within a few hours thereafter, he "transferred to a small memorandum book" the "result" of his original entries on the shingle.

The dictum in *Pierce* indicates that the memorandum book, even though "[t]he absence of the shingle upon which the original memoranda were made was unaccounted for . . . " (94 Me. p. 176, 47 A. p. 146) should have been admissible as substantive evidence on the principle of past recollection recorded.

It is not clear whether in *Pierce* the Court was regarding the memorandum book as itself a *sufficient original* within the meaning of the best evidence rule. To the extent, however, that it might not have been and that the dictum in *Pierce* might be interpreted as suggesting that the best evidence rule is not applicable when the contents of a record are used as evidence of independent matters in issue under the principle of past recollection recorded, we now clarify that such interpretation of the dictum in *Pierce* would be erroneous. The best evidence rule is operative and secondary evidence is inadmissible unless and until the lack of the best evidence has been accounted for in accordance with requirements of the best evidence rule.

Plaintiff's second claim of reversible error in evidentiary rulings concerns the refusal of the presiding Justice to admit into evidence, as an exhibit, a "Thomas collar", so-called, which was disclosed by testimony to have been worn by plaintiff for therapeutic purposes.

■■■ Regardless that the evidence reveals uncertainty as to whether the Thomas collar had been initially prescribed by a physician or had been used by the plaintiff on his own, and independently of whether there might have been a sufficient acknowledgement by an attending physician of its therapeutic benefit to plaintiff,[2] the admissibility into evidence of an object or article which testimony tends to make relevant as an evidentiary exhibit in the nature of "demonstrative" or "real" evidence, lies, essentially, in the discretion of the presiding Justice. Thompson v. Columbian Nat. Life Insurance Company, 114 Me. 1, 5, 95 A. 229 (1915); State v. Bennett, 158 Me. 109, 113, 114, 179 A.2d 812 (1962). Cf. State v. Duguay, 158 Me. 61, 178 A.2d 129 (1962); State v. Chaplin, Me., 286 A.2d 325 (1972). 29 Am.Jur.2d, Evidence § 771, p. 841, and appropriate cases cited therein in n. 8.[3]

While such discretion should generally be exercised liberally to admit relevant "demonstrative" or "real" evidence which tends to have probative value, in accordance with the general basic principle favoring the admissibility of evidence of probative force, there remains a large discretion invested in the presiding Justice to evaluate whether the probative benefits of allowing an object or article into evidence as an exhibit are fundamentally minimal or trivial or, even if substantial, are nevertheless overridden by other extraneous nonprobative factors. State v. Duguay, supra, Thompson v. Insurance Company, supra.

Here, the record shows that the presiding Justice had made an evaluation and had determined that the rights of the plaintiff effectively to present the matters which probatively supported his cause were adequately asserted without need that the "Thomas collar" become an exhibit.

■■■ We cannot say that such conclusion by the presiding Justice was an abuse of discretion constituting reversible error— especially since, as the presiding Justice noted, plaintiff had been allowed to demonstrate to the jury how he had worn the collar and how it had functioned, and the jury, as they sat in the jury box, were allowed to, and did, examine it.

*The Denial of the Motion for Mistrial*

Plaintiff further maintains, however, that the presiding Justice's *overall* treatment of

2. Plaintiff seemed to have been claiming that Dr. Brinkman had prescribed the Thomas collar. In his testimony, however, Dr. Brinkman testified in reply to questions placed by counsel for the plaintiff:

"Q And did you prescribe a treatment for him, Doctor?

"A I did not.

"Q Was there any treatment prescribed for him at home?

"A I felt that the symptoms would probably clear, suggesting that if they persisted that he may necessitate further treatment.

"Q Now, Doctor, did you at that time mention anything about Mr. Cope obtaining a Thomas collar if his condition persisted?

 * * * * *

"A I would have to answer it the same way, that if the condition persisted, he might need a collar. I did not suggest that he get a collar at that time."

Another physician, Dr. Monkhouse, who had been consulted by the plaintiff after Dr. Brinkman had seen the plaintiff acknowledged that the use of a Thomas collar was "good treatment", whether or not it had in fact been prescribed. He, therefore, had advised the plaintiff that "the wearing of the Thomas collar should be gradually eliminated, and this was done" by plaintiff.

3. McMann v. Reliable Furniture Co., 153 Me. 383, 395-399, 140 A.2d 736 (1958) confirms this principle in a situation in which the instrumentality itself (an exact replica of a "Blount blade plate") was neither offered nor admitted into evidence but was utilized illustratively by a physician in his testimony.

the Thomas collar in the presence of the jury must have created prejudice diminishing the value of plaintiff's case in the minds of the jury, and that, therefore, the presiding Justice committed reversible error in denying a motion for a mistrial timely made by plaintiff after the occurrence of the incidents.

In this connection, plaintiff relies on the additional facts that after the presiding Justice had refused to allow the Thomas collar into evidence as an exhibit, the presiding Justice had replied to a request of counsel for the plaintiff that the jury be allowed to examine the collar in the jury box, by uttering the remark: "What do you want them to do, feel of it?" Several jurors thereupon laughed. Counsel for plaintiff then explained to the presiding Justice that he wished the jury to examine the collar so that they could ascertain its condition and thereby corroborate the testimony of plaintiff that he had worn it extensively. Thus informed of the purpose of the request by plaintiff's counsel, the presiding Justice recognized that the jurors should make an examination of the Thomas collar and he authorized it. He then said:

> "In case you made any plans, you estimated that you would get through today, but we never will now."

Plaintiff contends that this conduct must have indicated to the jury that the presiding Justice thought that the manner in which plaintiff's case was being presented was ridiculous and tended to belittle the plaintiff's claim of injuries, thereby to cause a persisting, irreparable prejudice against plaintiff which would prevent him from having a fair trial.

We have already concluded that the jury's award of damages is rationally explicable upon all of the evidence. We are likewise mindful of the fundamental principle that the granting or denial of a mistrial is a matter as to which the presiding Justice is allowed a broad discretion. Thus fortified, we decide that the denial by the presiding Justice of plaintiff's motion for a mistrial—as a judgment by the presiding Justice, which, when made, represented an evaluation of whether any prejudice had then been created, and if any, whether it would be likely irreparably to continue—was a proper exercise of discretion.

The record reveals nothing (either in the form of a purported characterization by counsel for the plaintiff, or otherwise) to indicate the facial expression or the tone, or inflection, of voice of the presiding Justice when he made the remarks in question. We must proceed, therefore, on the premise that there was absent any derisive manner of expression by the presiding Justice, and we examine his words on their face to ascertain their reasonable import in objective terms.

The inquiry by the presiding Justice, in the circumstances apparent of record, fairly suggests an initial reaction by him questioning whether there was a valid purpose to be served by having each juror take the Thomas collar into his hands for closer scrutiny—especially since the record shows a persistent concern by the presiding Justice to avoid possible waste of time with procedures likely to be without value to the progress of the case. That some jurors might have laughed when the Judge asked his question is insufficient to connote that they found the efforts of counsel for plaintiff so absurd that they would become prejudiced against plaintiff's cause. The laughter could well have been an immediate response to an element of humor, or lightness, which some, according to their individual attitudes, might have perceived.

Furthermore, we are aware of the additional factors that: (1) the presiding Justice, upon being informed by counsel for the plaintiff of his purpose in asking for the examination, allowed the jury to examine the Thomas collar and further clarified that his initial reluctance was in part motivated by a desire to save time and, if possible, finish the case that same day (apparently in view of plans which participants

might have had in mind) ; (2) the presiding Justice could properly have concluded that any possibility of detriment to the plaintiff was remediable by him through a curative instruction to the jury; and (3) the presiding Justice in fact gave such a curative instruction at the outset of his charge.[4]

In light of all these circumstances, that there had been created by the actions of the presiding Justice an irremediably persistent prejudice against plaintiff, if prejudice at all, seems too remote a possibility to have required a mistrial. The presiding Justice properly acted within the scope of his discretion in denying the motion for mistrial.

The entry is:

Appeal denied.

---

4. The Judge charged the jury:
"Remember, that you are exclusively the finders of fact, and it is not my business to give you any opinion of fact that I might have, if I had one—the law prohibits me from doing this. So, if in anything I may have said, or any facial expression, or anything else you feel that I have offered an opinion as to any issue of fact in this case, disregard it, because if I did, it would be through inadvertence alone. I re-emphasize, you are the persons who decide the facts in this case."

\* \* \* \* \*
"The parties expect that you will carefully and impartially consider the evidence which you did hear, and reach a just verdict without sympathy, bias, or prejudice, looking at it as intelligent people with a disposition to be fair to both sides. The parties expect that, the Court expects it, and we both join in our belief that that's exactly what you will do."