**Ronald BANVILLE**

v.

**Paul HUCKINS and Thomas Bucknam.**

Supreme Judicial Court of Maine.

Oct. 29, 1979.

Erwin, Austin & Lucas, P. A. by Ralph W. Austin (orally), James S. Erwin, York, for plaintiff.

George S. Hutchins, Jr. (orally), York, for Huckins.

Cole & Daughan by Francis P. Daughan (orally), Wells, for Bucknam.

Before McKUSICK, C. J., and WER-NICK, ARCHIBALD, GODFREY and NICHOLS, JJ.

ARCHIBALD, Justice.

The plaintiff purchased a home from the defendants. On occupancy the plaintiff discovered that the basement would flood following a rainstorm and he also discovered that the well water was nonusable for domestic purposes. As a result, this action ensued premised (1) on a breach of implied warranty of habitability, (2) on breach of contract, and (3) on a violation of the Uniform Trade Practices Act. In a jury-waived trial the single justice found the defendants were guilty of a breach of an implied warranty of habitability, and he assessed damages for the plaintiff in the sum of $12,500. He also ruled, however, that the plaintiff had failed to prove his allegation of breach of contract and viola-tion of the Uniform Trade Practices Act. The defendants appealed from the ensuing judgment, and the plaintiff cross-appealed from the decision concerning breach of contract and the ruling on the Uniform Trade Practices Act.

We deny both appeals and affirm the judgment in favor of the plaintiff for $12,-500.

## FACTS

The real estate involved is located in the town of York. Prior to its acquisition by the plaintiff, the title to the land had been acquired in the names of both defendants. After acquiring title to the land, the defendants erected thereon a dwelling house. This house was prefabricated, but the defendants had to prepare and grade the lot and construct a foundation for the house. When the house was nearly completed, both defendants signed a "Contract for Sale of Real Estate" with the plaintiff. The original price was $36,000, but another $3,000 was added thereto in order to finish the basement.[1]

The land on which this home was constructed was in an area lower than the surrounding terrain, the adjacent road being some three to four feet above the top level of the foundation. The garage was located in the basement of the house beside the family room. Entrance to the garage was gained by using a ramp which necessarily sloped downward.

The plaintiff completed the purchase in accordance with the contract terms, accepting a deed executed by both defendants.

Shortly after occupancy, it became apparent that the water supplied from a drilled well was unsatisfactory and, because of its

---

1. The contract included these additional specifications for completion of the basement:

Sellers agree to finish a family room, bathroom, and closet in the basement. Full cedar in closet under the stairs. Full $3^3/_{10}''$ insulation from all exterior walls in family room and bath. Family room to be finished with . . . Masonite panelling in color of buyer's choice, electric heat as specified by Central Maine Power, and at least 4 outlets, suspended ceilings. $^2/_3$ bath (no tub or shower) at least 5′ × 5′ in location of buyer's choice, drywall walls taped and finished, toilet on raised platform with 5 foot ceiling above, bathroom to have drywall ceiling and electric heat. Two light fixtures in the family room and one in the bath. Electric heat unit to be installed in laundry area. Basement side of garage wall to be drywalled and door installed. Landscaping & hot-topping of driveway to be completed by sellers.

excessive metallic content (iron magnesium), was not usable for drinking, bathing, or laundry. The plaintiff and his wife were obliged to get water from another source for usual domestic use. Neither the plaintiff nor his wife was aware of this problem prior to acceptance of the deed and occupancy of the premises.

After the plaintiff and his wife had moved into their new home, they discovered that following a rainstorm water would run into the basement, on occasions rising as high as ten inches.[2] The plaintiff was unaware of this propensity until after the purchase and sale had been completed. Various methods were attempted to meet this problem, including the installation of a new drain and digging a dry well outside the foundation. The only satisfactory method to rid the basement of accumulated water was the utilization of a pump.

The plaintiff introduced testimony from an experienced general contractor, who concluded that the only feasible way to eliminate the flooding problem was to disconnect the house from its foundation, raise the house a sufficient amount so that the foundation wall could be heightened, fill the basement to raise the floor an equivalent distance, pour a new basement floor, and then lower the house back onto the elevated foundation, re-connecting the utilities, wiring, etc. The estimated cost of such a project was $11,777. There was evidence that the permanent installation of a pump would cost $500.

The plaintiff testified that his home in its then condition, because of the flooding and poor water supply, had no value. Another witness, however, agreeing that the house, if habitable, should have been fairly worth its purchase price, was of the opinion that its only value under existing conditions was for some type of warehousing.

The single justice stated: "In my opinion the plaintiff does not need to put up with this pump solution. He would still have a brook in his cellar." He then ruled that "building a house in a water pocket was a

design failure on the part of the builder-vendors and they are responsible for it under the implied warranty of habitability." The single justice then found damages to be $12,500 but also stated, "the plaintiff failed to prove his other two counts."

## IMPLIED WARRANTY OF HABITABILITY

It is clear from the decision that damages were not predicated on the defective water supply because the justice stated: "There is no direct or opinion evidence of the defective well damage." In arriving at the damages, the justice ruled that the measure of damage "is the difference in value as set by the contract and what the purchaser received," citing as authority *Gosselin v. Better Homes, Inc.*, Me., 256 A.2d 629, 640 (1969).

■ As we have recently held, the acceptance by the plaintiff of the deed from the defendants does not prevent him from seeking damages for breach of warranty by the defendants who are builder-vendors. *Wimmer v. Down East Properties, Inc.*, Me., 406 A.2d 88 (1979). It would be irrational to say that such a conclusion would not be equally applicable to the matter now under consideration where the plaintiff purchaser is alleging breach of an implied warranty of habitability against the builder-vendors.

■ Maine has not definitively held that a builder-vendor is liable to a purchaser for breach of an implied warranty of habitability. In *Wimmer* we expressly held that a builder-vendor of a new home impliedly warranted that the work involved in the construction thereof would be performed in a reasonably skillful and workmanlike manner. In reaffirming our holding in *Gosselin*, we pointed out in *Wimmer* that "[t]here is no good reason for distinguishing the contractor who builds for a landowner from the contractor who builds on his own land for the purpose of sale." *Id.* at 92. *Wimmer*, however, avoided adoption of an implied warranty of habitability because it

---

2. The single justice had before him certain photographs of the basement area taken following periods of flooding, which indicate the water marks on the furniture and walls.

was an issue not necessarily raised by the facts therein. We conceive no rational basis, however, for not adopting such a doctrine, bearing in mind that this holding is restricted to facts similar to those of this case wherein we are dealing only with the relationship existing between a contract purchaser of real estate and the builder-vendors of that particular property.

Other jurisdictions have reached a comparable result, particularly when they are concerned with the relationship between builder-vendor and purchaser. *See, e. g., Rutledge v. Dodenhoff*, 254 S.C. 407, 175 S.E.2d 792 (1970); *Wawak v. Stewart*, 247 Ark. 1093, 449 S.W.2d 922 (1970); *Conyers v. Molloy*, 50 Ill.App.3d 17, 7 Ill.Dec. 695, 364 N.E.2d 986 (1977). *See* Annot., 25 A.L.R.3d 383, 413. Our adoption of an implied warranty of habitability is consistent with precedent and is a logical extension of the doctrines espoused in *Wimmer* and *Gosselin.*

 We next must determine whether the facts of this case fall within the parameters of this implied warranty. Habitability is a term difficult of precise definition. Every minor defect in a new home does not necessarily make the structure uninhabitable. On the other hand, the warranty should not be defined in such strict terms as to require the defect to be of such magnitude as to require that the structure be deemed unlivable. Thus, we are required to look at each situation and to analyze the extent, or magnitude, of the defect and determine whether it resulted in unsuitability for habitation, as we suggested in *Wimmer.* Whether or not a particular defect renders the dwelling "unsuitable" necessarily requires inquiry as to whether a reasonable person faced with such a defect would be warranted in concluding that a major impediment to habitation existed.

 Reverting to the facts of the case before us, we have a situation where a basement area which was planned and designed for family occupancy becomes unusable as such following rainstorms. Certainly a reasonable person would not live in an area subject to the threat of flooding every time it rains. In footnote 1, *supra,* we delineated specifications for this area to emphasize that it was the intent of the parties to the contract that this basement area should be and remain usable for a variety of family purposes. Eight to ten inches of water periodically flooding this room clearly falls within the parameters of our concept of uninhabitability. *Hanavan v. Dye*, 4 Ill.App.3d 576, 281 N.E.2d 398 (1972), was a case in which the contractor-builder had made a direct sale of a home to the plaintiff-purchaser and is comparable to the instant case on its facts because it involved flooding of a basement area "in places up to the plaintiffs' ankles." The Illinois court adopted the implied warranty of habitability under those circumstances and assessed damage, using the rule that the cost of remedying the defects or deficiencies is a proper measure of damage in such cases. As illustrated in *Hanavan,* the implied warranty of habitability attached even though there was no structural defect, and the unsuitable nature of the site selected for the home was responsible for the damage.

We conclude that the single justice correctly applied the doctrine of implied warranty of habitability to the facts before him.

Defendant Bucknam has argued that he should not be responsible to the plaintiff because there was no partnership in existence, and that the co-defendant should be solely responsible for the damages. We do not agree. The implied warranty of habitability came into being when the purchase and sale agreement was signed by *both* defendants. *See Ripley v. Crooker*, 47 Me. 370, 378 (1860); 4 Corbin, Contracts §§ 925–28 (1951); *cf. Don L. Tullis & Associates, Inc. v. Gover*, 577 S.W.2d 891, 900 (Mo.App. 1979) (holding that where two or more persons undertake the performance of an obligation the presumption is that the undertaking is joint, words of express joinder not being necessary, but words of severance being required to produce a several responsibility, absent which the undertaking becomes joint and not several).

As we have noted, Mr. Bucknam was not only a co-signer of the purchase and sale contract, but also was active in the entire transaction. He was a co-owner of the property, co-signer of both a mortgage deed and the conveyance to the plaintiff. Likewise, he participated in efforts to remedy the defects when they became noticeable.

■ Mr. Bucknam is equally responsible with Mr. Huckins for the damages flowing from the breach of implied warranty of habitability.

■ The defendants next argue that the single justice applied the wrong measure in assessing damages. Additionally, they argue that the finding of damage was not supported by the evidence. We reject both positions. The justice cited *Gosselin v. Better Homes, Inc.*, Me., 256 A.2d 629 (1969), when reaching his decision on damages. In *Gosselin* we stated: "The measure of damages in matters of this nature, as a general rule, is the difference in value between what is tendered as performance and what is due as performance under the contract, and this may consist of the amount required to remedy the defect." *Id.* at 640, quoting *Brourman v. Bova*, 198 Pa.Super. 279, 182 A.2d 245 (1962). By holding that the plaintiff did not have to tolerate "a brook in his cellar," the justice rejected the argument that the installation of a pump costing $500 would be adequate damages. He was thus faced with an appraisal of the only evidence of damage which had been admitted, namely, (a) the plaintiff's testimony that the property was worthless; (b) the testimony that the structure was no longer habitable but could be used as a warehouse; and (c) a contractor's testimony that it would cost an *estimated* $11,777 to restore the house to a habitable condition. The ultimate conclusion that the damages were $12,500 certainly is consistent with the evidence given by the contractor and, faithful to the mandate of *Gosselin*, that damages "may consist of the amount required to remedy the defect."

The collateral argument that the damages were excessive runs squarely against our well-accepted doctrine that damage assessment is the sole province of the fact-finder and will not be disturbed on appeal absent a showing that bias, prejudice, or improper influence motivated the result or that it was the product of a mistake of fact or law. *McMann v. Reliable Furniture Co.*, 153 Me. 383, 391, 140 A.2d 736, 741 (1958); *see also Cayer v. Lane*, Me., 390 A.2d 467, 468 (1978).

## CROSS–APPEAL

### 1. *Admissibility of non-expert testimony of well damage*

The plaintiff argues on cross-appeal that he was improperly denied the opportunity to testify as to the remedial measures which could have been taken to cure the well-water problems, resulting in no evidence being admitted on that facet of damages.

■ When evidence is excluded upon objection and the purpose for which it is offered is not readily apparent, an offer of proof is required. M.R.Evid. 103(a)(2). Absent such offer, the ruling will be upheld if there is any reason for which the evidence might be excluded. *Utz v. Utz*, Me., 273 A.2d 303 (1971). The plaintiff was questioned as to remedial measures in a sequence following introduction of scientific results of water analysis. In that context, the trial justice apparently assumed that the proposed testimony called for expert opinion on the scientific methods of alleviating the high concentration of iron magnesium. Since the plaintiff made no offer of proof indicating otherwise, the ruling must stand. *Utz, supra.*

### 2. *Unfair Trade Practices Act*

■ The plaintiff argues finally that the trial court erred in ruling that he failed to prove a violation of the Maine Unfair Trade Practices Act, 5 M.R.S.A. § 206 *et seq.* He would have the court adopt what amounts to a *per se* rule, *i. e.*, that a violation of an implied warranty is an unfair trade practice. We decline to do so.

Our recent decision in *Bartner v. Carter*, Me., 405 A.2d 194 (1979), discusses the requirements for maintaining an action under

the Act. In *Bartner*, we concluded that a private action under section 213 is available as a claim for restitution in order that a consumer recover benefits conferred on the person causing the loss of money or property. Like *Bartner*, the three counts of plaintiff's claim do not state a claim for restitution. Thus, he cannot recover under the Act.

The entry is:

Defendants' appeal denied.

Plaintiff's cross-appeal denied.

Judgment affirmed.

POMEROY and GLASSMAN, JJ., did not sit.