2003 ME 107

**STATE of Maine**

v.

**Norma SMALL.**

Supreme Judicial Court of Maine.

Argued: June 10, 2003.
Decided: Aug. 14, 2003.

G. Steven Rowe, Attorney General, Donald W. Macomber, Asst. Attorney General (orally), Andrew Benson, Asst. Attorney General, Augusta, for State.

Christopher K. MacLean, (orally), MacLean & MacLean, LLC, Camden, for defendant.

Panel: SAUFLEY, C.J., and CLIFFORD, RUDMAN, DANA, ALEXANDER, CALKINS, and LEVY, JJ.

RUDMAN, J.

[¶ 1] Norma Small appeals from judgments of conviction for murder in violation of 17–A M.R.S.A. § 201(1)(A) (1983),[1] and

---

1. This section provided:

1. A person is guilty of murder if:

theft by unauthorized taking or transfer (Class B), in violation of 17–A M.R.S.A. § 353(1) (1983),[2] entered in the Superior Court (Sagadahoc County, *Mills, C.J.*) following a jury trial. Small raises two contentions: (1) the court improperly analyzed the admissibility of certain hearsay statements offered by the State as "statements against interest" pursuant to M.R. Evid. 804(b)(3), and (2) the court violated her Sixth Amendment right to confront her accusers when it admitted the statements. We disagree and affirm the judgments.

## I. FACTS

[¶ 2] The jury could have found the following facts beyond a reasonable doubt: Mervin "Sonny" Grotton died on December 16, 1983, after sustaining a fatal gunshot wound while walking in the driveway leading to his home located on 12 White Street in Belfast. Sonny and the defendant, Norma Small (f/k/a Norma Grotton), had been married for twenty-six years.

[¶ 3] In the early 1980s, Sonny, an enlisted naval serviceman, was assigned to a base in Newport, Rhode Island, where he worked as a machinist-mate instructor until his death. Sonny lived and worked in Rhode Island during the week and returned to the family's Belfast home at the same time every Friday evening.

[¶ 4] In the summer of 1982, Boyd Smith, the boyfriend of one of the Grottons' daughters, moved into Sonny and Small's White Street home. Shortly after Smith moved into the house, Small began telling Smith that she wanted somebody to kill her husband.[3] In early 1983, after "quite a few" preliminary conversations, Small offered to pay Smith $10,000 if he would kill Sonny.

[¶ 5] Smith considered the proposition and decided to conduct a "dry run" of the execution to determine if the murder would be possible. One night, in February 1983, he hid behind the house and watched Sonny return from work. After simulating the murder, however, Smith informed Small that he would be unable to accomplish the plan. Small was "angry" and repeatedly demanded that Smith find another person to commit the murder. Smith ultimately succumbed to Small's requests and, a few weeks after performing the "dry run," he agreed to help Small find another triggerman.

[¶ 6] Smith and Small decided to contact Joel Fuller because "he had a reputation for being a nut case, a wild man." Smith and Fuller met at a local bar where Fuller expressed interest in the proposal and took Small's contact information. After the meeting, Smith told Small that Fuller would contact her directly, and he testified that he had no further discussions with either Small or Fuller regarding the mur-

---

A. He intentionally or knowingly causes the death of another human being;

The Legislature later amended this section. *See* P.L.2001, ch. 383, § 8 (effective Jan. 31, 2003) (current version at 17–A M.R.S.A. § 201(1)(A) (Supp.2002)).

**2.** This section provided:
> 1. A person is guilty of theft if he obtains or exercises unauthorized control over the property of another with intent to deprive him thereof.

The Legislature has also amended this section. *See* P.L.2001, ch. 667, § D–3 (effective Jan. 31, 2003) (current version at 17–A M.R.S.A. § 353(1) (Supp.2002)).

**3.** The record reflects that Sonny and Small had experienced relationship difficulties during the course of their marriage. Before Sonny's death, for example, some of Small's friends overheard her state that she would be "better off if [Sonny] was dead than alive," and "[Sonny's] worth more dead than alive."

der plot.[4] Karen Reed, Fuller's cousin, and an acquaintance of Small in the late 1970s and early 1980s, testified that she saw Fuller at Small's house two or three times before Sonny's death.

[¶ 7] On Friday, December 16, 1983, Small was home playing cards with a friend while Small's son, Michael, played guitar in his bedroom with a friend. Between 7:30 and 8:00 P.M., a loud bang was heard coming from outside the house. Sonny was found lying in the driveway bleeding profusely. Emergency medical technicians transported Sonny to Waldo County Hospital where he was pronounced dead later that evening. Sonny died from gunshot wounds to the face and trunk region.

[¶ 8] Law enforcement personnel arrived at the scene between 8:30 and 9:00 P.M., secured the location, and began searching for physical evidence. Investigators discovered two spent 30/30 rifle casings between two woodpiles located in the Grotton's backyard. The casings were found approximately thirty to forty feet from the spot where Sonny fell after being shot. The investigators did not find any other physical evidence that evening. An autopsy performed the next day indicated that three bullets hit Sonny.

[¶ 9] In the winter of 1984, Fuller and Larry Phillips, his best friend at the time, were drinking while driving throughout Waldo County heading towards Rockland. As the vehicle approached the intersection of Back Belfast Road and Route 173, Fuller told Phillips that a 30/30 rifle was located by a brook on the right-hand side of the intersection. Phillips, a gun collector, decided not to look for the rifle, however, because Fuller informed him that it was

severely damaged when he "smashed it against a telephone pole."

[¶ 10] Later that day, as the two continued driving, Fuller told Phillips that he "was paid to shoot some guy on White Street." He said that the victim was in the service; that he waited behind a woodpile for him to get home; that he first shot the man in the back as he reached for the door; and that he then shot the victim in the head as he attempted to cover his face with his hand.

[¶ 11] In May of 1985, Lloyd Bryant found a damaged lever-action rifle while fishing with his brothers in a river near the intersection on Route 173 where Fuller had previously told Phillips he could find a damaged 30/30 rifle. The rifle was turned over to the State Police where it was analyzed and later identified as a lever-action 30/30 caliber Winchester rifle. The State Police asked a firearms and tool-mark examiner to assess the rifle's connection to the Sonny Grotton homicide. The firearms examiner test-fired the weapon and compared the resulting test cartridge casings to those recovered near the woodpile at the crime scene. He, however, could not make a proper identification of the test cartridges and, thus, could not make a determination of whether the shell casings found at the crime scene were fired from the 30/30 rifle found by Lloyd Bryant.

[¶ 12] As part of the investigation, law enforcement authorities conducted two undercover interviews with Small in an attempt to determine her role in Sonny's murder and, specifically, to ascertain her connection to Fuller. Pursuant to the plan, a special agent from the Naval Criminal Investigative Service posed as one of Fuller's jailhouse acquaintances, ostensibly sent by Fuller to ask Small who had been

---

**4.** A Grand Jury separately indicted Boyd Smith and Joel Fuller for their roles in Sonny's death. They were acquitted after separate jury trials, in February 2002 and February 2003, respectively.

cooperating with the police. Small told the agent to tell Fuller that she was not the snitch, that she "expect[ed] the same," and to "sit tight."

[¶ 13] On May 7, 2001, a Waldo County grand jury issued a two-count indictment against Small, charging her with intentionally or knowingly causing Sonny's death in violation of 17–A M.R.S.A. § 201(1)(A) (1983), amended by P.L.2001, ch. 383, § 8 (count I), and theft by unauthorized taking or transfer (Class B) in violation of 17–A M.R.S.A. § 353(1) (1983), amended by P.L. 2001, ch. 667, § D–3 (count II).[5] Two days later, Small was arrested in Iola, Kansas, where she then resided, and law enforcement authorities interviewed her at the Iola police station once she was in custody. During the interview, Small admitted asking Smith to kill Sonny for $10,000. She maintained, however, that she later changed her mind, but could not find Smith to stop him. She also denied meeting Fuller and expressed her belief that Smith was the triggerman.

[¶ 14] A jury trial was held in the Superior Court in July 2002.[6] The State's theory of the case was as follows: Small first asked Boyd Smith to kill Sonny; Smith declined, informed Fuller of Small's proposition, arranged for Small and Fuller to meet directly, and, ultimately, that Fuller committed the murder. Small testified and denied participating in Sonny's murder, or being acquainted with, or meeting with, Fuller.

[¶ 15] The crux of the present appeal focuses on the testimony of Larry Phillips. The State called Phillips as a witness and asked him to relate what Fuller told Phillips in the winter of 1984 when the two were driving in Waldo County near the intersection of Route 173 and Back Belfast Road. Small objected on hearsay grounds, and the State proffered that the testimony was admissible as "statements against interest" pursuant to M.R. Evid. 804(b)(3).

[¶ 16] Following Small's general objection, the court dismissed the jury and held a lengthy discussion on the admissibility of Phillip's testimony. The parties determined that *State v. Cochran*, 2000 ME 78, 749 A.2d 1274, provided the requisite test for determining the admissibility of Fuller's out-of-court statements.[7] Small interpreted *Cochran* to require the State to satisfy all four of the third prong's subfactors to qualify pursuant to the exception.

[¶ 17] The State contended that Phillips's testimony was admissible because Fuller's statements were corroborated by evidence in the record and therefore reliable. The court ultimately admitted Phillips's testimony, stating that it was persuaded that Fuller's statements satisfied the Rule's three-prong test.

---

5. The latter count arose from Small's application to the United States Department of Veterans' Affairs for survivor's benefits following Sonny's death. At trial, the parties stipulated that Small applied for and received $88,270 in benefits between October 1, 1992 and May 1, 2001.

6. The trial had been transferred to Sagadahoc County on Small's motion to change venue.

7. *Cochran* sets forth a three-prong test for the admissibility of hearsay statements against interest. *State v. Cochran*, 2000 ME 78, ¶ 11, 749 A.2d 1274, 1278. The third prong—the only prong at issue in this case—states that "the statement must be corroborated by circumstances that 'clearly' indicate its trustworthiness." *Id.* When evaluating the third prong, courts consider the following four additional factors: "(1) the time of the declaration and the party to whom it was made; (2) the existence of corroborating evidence in the case; (3) whether the declaration is inherently inconsistent with the accused's guilt; and (4) whether at the time of the incriminating statement the declarant had any probable motive to falsify." *Id.* ¶ 12 (citation omitted).

[¶ 18] The jury returned guilty verdicts on both counts, and the court sentenced Small to the Department of Corrections for a term of sixty years for murder, and a consecutive term of ten years for theft.

[¶ 19] This appeal followed.

## II.  DISCUSSION

[¶ 20] Small asserts the Superior Court analyzed the admissibility of Fuller's hearsay statements pursuant to the wrong legal standard.   She contends that the court erred by relying exclusively on the three-prong test set forth in *Cochran* and, as a result, it failed to consider whether the statements violated her rights guaranteed by the Confrontation Clause of the Sixth Amendment to the United States Constitution.[8]   Small argues that admitting Fuller's hearsay statements violated her Confrontation Clause rights because the statements were not sufficiently reliable, and, moreover, that the violation was not harmless because the statements were crucial to the State's case.

[¶ 21] Small's arguments require a two-step inquiry: first, we must determine whether the court erred in finding the evidence falls within the exception to the hearsay rule contained in M.R. Evid. 804(b)(3), and, second, we must ascertain whether admission of the testimony offends the Confrontation Clause of the Sixth Amendment. *United States v. Westmoreland*, 240 F.3d 618, 626 (7th Cir.2001) (noting that whether hearsay testimony admitted pursuant to FED. R. EVID. 804(b)(3) violates the Confrontation Clause requires the threshold determination of whether the court properly admitted the evidence under the Rule); *see Dutton v.*

*Evans,* 400 U.S. 74, 86, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970) ("It seems apparent that the Sixth Amendment's Confrontation Clause and the evidentiary hearsay rule[s] stem from the same roots.   But this Court has never equated the two . . . .").

### B.   Legal Analysis

[¶ 22] This appeal requires a discussion of both Rule 804(b)(3) and the Confrontation Clause.   A baseline premise in this area of the law is that statements may be admissible pursuant to an exception to the hearsay rule, but inadmissible under the Confrontation Clause, because the two inquiries are not coterminous.   *United States v. Barone,* 114 F.3d 1284, 1299 (1st Cir.1997); *see Dutton,* 400 U.S. at 82 ("[W]e have more than once found a violation of confrontation values even though the statements in issue were admitted under an arguably recognized hearsay exception.").   As a result of this distinction, we must first evaluate the admissibility of Fuller's statements pursuant to the Rule.

### 1.   Rule 804(b)(3)

■ [¶ 23] "We review the trial court's evidentiary rulings for clear error and an abuse of discretion." *State v. Corbin,* 2000 ME 167, ¶ 5, 759 A.2d 727, 729 (internal quotation omitted).

[¶ 24] M.R. Evid. 804(b)(3) provides, in relevant part:

A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject the declarant to civil or criminal liability . . . that a reasonable person in the declarant's posi-

---

8.   The Sixth Amendment states, in relevant part, "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . ." U.S. CONST. amend.  VI; *see also Douglas v. Ala-*

*bama,* 380 U.S. 415, 418, 85 S.Ct. 1074, 13 L.Ed.2d 934 (1965) (holding the Confrontation Clause of the Sixth Amendment is applicable to the States).

tion would not have made the statement unless believing it to be true. A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement. A statement or confession offered against the accused in a criminal case, made by a codefendant or other person implicating both the declarant and the accused, is not within this exception.

■ [¶ 25] We have established the following three-prong test for the admissibility of an out-of-court statement pursuant to the rule:

1. the declarant must be unavailable as a witness;

2. the statement must so far tend to subject the declarant to criminal liability that a reasonable person in the declarant's position would not have made the statement unless the declarant believed it to be true; and

3. the statement must be corroborated by circumstances that "clearly" indicate its trustworthiness.

*Cochran*, 2000 ME 78, ¶ 11, 749 A.2d at 1278. When evaluating the third prong, however, courts should consider the following four additional factors:

1. the time of the declaration and the party to whom it was made;

2. the existence of corroborating evidence in the case;

3. whether the declaration is inherently inconsistent with the accused's guilt; and

4. whether at the time of the incriminating statement the declarant had any probable motive to falsify.

*Id.* ¶ 12 (citation omitted).

[¶ 26] The rule contemplates two general scenarios in which a statement against interest may be offered: (1) by the accused to exculpate himself, or, as in this case, (2) by the State to inculpate the accused. *See* M.R. Evid. 804(b)(3); *compare Cochran*, 2000 ME 78, ¶ 9, 749 A.2d at 1278 (hearsay statement offered by the defendant), *with State v. Hassapelis*, 569 A.2d 192, 193–94 (Me.1990) (hearsay statement offered by the State to inculpate the defendant).

[¶ 27] By its terms, the Rule only requires that "corroborating circumstances clearly indicate the trustworthiness of the statement" when the statement is offered in the former scenario, i.e., when the accused seeks to admit hearsay statements that shift culpability for the crime to another party. M.R. Evid. 804(b)(3); 5 JACK B. WEINSTEIN & MARGARET A. BERGER, WEINSTEIN'S FEDERAL EVIDENCE § 804.06[6][b] (2d ed.2002) (interpreting similar provision in FED. R. EVID. 804(b)(3)) (hereinafter WEINSTEIN at ___). Although the Rule does not explicitly require corroboration for statements offered by the State, *see* M.R. Evid. 804(b)(3), many jurisdictions apply the Rule as if corroboration is required regardless of which party seeks to admit the statement. WEINSTEIN at 804–71; *e.g., Barone*, 114 F.3d at 1299.[9]

9. The United States Supreme Court has explicitly declined to decide whether FED. R. EVID. 804(b)(3) requires corroboration when the government offers statements that inculpate the accused. *Williamson v. United States*, 512 U.S. 594, 605, 114 S.Ct. 2431, 129 L.Ed.2d 476 (1994) ("We also need not decide whether, as some Courts of Appeals have held, the second sentence of Rule 804(b)(3)—

'A statement tending to expose the declarant to criminal liability *and offered to exculpate the accused* is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement' (emphasis added)—also requires that statements inculpating the accused be supported by corroborating circumstances.").

■ [¶ 28] The court, in this case, did not exceed the bounds of its discretion when admitting Fuller's hearsay statements pursuant to Rule 804(b)(3). Small does not dispute that Fuller was unavailable or that the hearsay statements subjected Fuller to criminal liability.[10] In its offer of proof, the State proffered that Phillips would testify that Fuller told him a damaged 30/30 rifle was located in a brook at an intersection of Route 173; that he hid behind a woodpile and used the rifle to shoot a serviceman on White Street; and that he shot the victim three times.

[¶ 29] Although Rule 804(b)(3) does not explicitly require the State to refer to evidence in the record that corroborates hearsay statements *offered to inculpate* a criminal defendant, *see* M.R. Evid. 804(b)(3), certainly the court did not err when it considered such evidence since, in this case, it relied on further evidence of the statements' trustworthiness for purposes of admissibility pursuant to the Rule.[11] Accordingly, the court acted within the bounds of its discretion when admitting Fuller's hearsay statements.

2. Confrontation Clause

■ [¶ 30] The next issue we must address is whether the admission of Fuller's hearsay statements violates the Confrontation Clause. When the government offers the hearsay statement of an unavailable declarant that incriminates the defendant, the Confrontation Clause provides added protection by requiring that the statements possess sufficient "indicia of

reliability." *Ohio v. Roberts*, 448 U.S. 56, 66, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980). The United States Supreme Court noted the reliability of certain "firmly rooted" hearsay exceptions. *White v. Illinois*, 502 U.S. 346, 356 n. 8, 112 S.Ct. 736, 116 L.Ed.2d 848 (1992) (noting that the hearsay exceptions for "spontaneous declarations" and "statements made for purposes of medical diagnosis" are firmly rooted); *see Idaho v. Wright*, 497 U.S. 805, 820–21, 110 S.Ct. 3139, 111 L.Ed.2d 638 (1990) ("Our precedents have recognized that statements admitted under a 'firmly rooted' hearsay exception are so trustworthy that adversarial testing would add little to their reliability."). When the exception is not firmly rooted, however, the Confrontation Clause requires the court to exclude the testimony absent a "showing of particularized guarantees of trustworthiness." *Roberts*, 448 U.S. at 66.

[¶ 31] In 1999, the United States Supreme Court discussed whether statements against interest constitute a firmly rooted exception. *Lilly v. Virginia*, 527 U.S. 116, 127–33, 119 S.Ct. 1887, 144 L.Ed.2d 117 (1999). In *Lilly*, a plurality of the Court stated that, because statements against interest define a broad spectrum of hearsay, a proper Confrontation Clause analysis of such statements must distinguish between those offered: "(1) as voluntary admissions against the declarant; (2) as exculpatory evidence offered by a defendant who claims that the declarant committed, or was involved in, the offense; and (3) as evidence offered by the prosecu-

---

**10.** Fuller was unavailable because he invoked his right against self-incrimination pursuant to the Fifth Amendment to the United States Constitution. *See* M.R. Evid. 804(a)(1) (defining "unavailability" to include "situations in which the declarant ... is exempted by ruling of the court on the ground of privilege from testifying") *see also State v. Hassapelis*, 569 A.2d 192, 194 (Me.1990).

**11.** We need not reach the issue of whether M.R. Evid. 804(b)(3) requires the court to consider corroborating evidence for inculpatory statements offered against the accused by the State because the court considered such evidence in this case.

tion to establish the guilt of an alleged accomplice of the declarant." *Id.* at 127. Statements falling within the third category were at issue in *Lilly*, as the government sought to admit the statements of the defendant's brother, made during police interrogation, in which the brother conceded his involvement in a shooting, but identified the defendant as the trigger-man. *Id.* at 121–22.

[¶ 32] The plurality concluded that accomplice confessions that *shift blame* from the declarant to the defendant are inherently unreliable and, therefore, not firmly rooted because they are often uttered in circumstances when the declarant has incentive to minimize his or her own culpability. *Id.* at 131–34. The plurality indicated, however, that the Confrontation Clause does not automatically preclude the government from introducing, as the State does in this case, a non-testifying accomplice's hearsay statements that do not shift blame for the crime from the declarant to the defendant. *See Lilly*, 527 U.S. at 134 n. 5; *United States v. Shea*, 211 F.3d 658, 669 (1st Cir.2000) ("*Lilly*'s main concern was with statements in which, as is common in police-station confessions, the declarant admits only what the authorities are already capable of proving against him and seeks to shift the principal blame to another . . . .").

[¶ 33] The Court noted that when the government seeks to introduce such non-blame shifting statements, it must demonstrate sufficient indicia of reliability. *See Lilly*, 527 U.S. at 134 n. 5. The government, however, cannot demonstrate such indicia—or, by extension, satisfy the Confrontation Clause—by merely citing evidence in the record that corroborates the truth of the statement, as might satisfy the third prong of Rule 804(b)(3). *See id.* at 137–38 ("We have squarely rejected the notion that evidence corroborating the truth of a hearsay statement may properly support a finding that the statement bears particularized guarantees of trustworthiness.") (internal quotations omitted.) "To be admissible under the Confrontation Clause, hearsay evidence used to convict a defendant must possess indicia of reliability *by virtue of its inherent trustworthiness, not by reference to other evidence at trial.*" *Wright*, 497 U.S. at 822 (noting that the existence of corroborating evidence is only relevant when assessing whether any error in admitting the testimony is harmless) (emphasis added). To evaluate a hearsay statement's "inherent trustworthiness," courts consider the totality of the circumstances that surround the making of the statement.[12] *Id.* at 820.

[¶ 34] In this case, the admission of Fuller's statements does not violate Small's Confrontation Clause rights and, therefore, the court did not commit error.[13]

---

12. We note that the Federal Judicial Conference's Advisory Committee on the Evidence Rules has proposed a substantive change to FED. R. EVID. 804(b)(3). *See* Advisory Committee on Evidence Rules, Minutes of the Meeting of April 19, 2002, http://www.uscourts.gov/rules/minutes.htm. The amendment requires that the "prosecution ... show[] 'particularized guarantees of trustworthiness'" when the prosecution offers a declaration against interest against a criminal defendant. *Id.* at 9. The proposed amendment is logical because, if approved, it will collapse the evidentiary and constitutional inquiries

into one analysis and, as a result, it will minimize the likelihood that trial courts will fail to engage in the constitutional inquiry when determining the admissibility of a statement pursuant to the Rule. *See id.* at 32. ("This standard is intended to assure that the exception meets the constitutional requirements [as reflected in *Lilly*], and to guard against the inadvertent waiver of constitutional protections.").

13. We note that our holding would be the same if Small had adequately preserved the Confrontation Clause argument at trial.

Some hearsay exceptions are inherently more reliable than others. Some exceptions, for example, address statements made in situations that eliminate the possibility of fabrication due to either lack of time, e.g., "excited utterances," *see* M.R. Evid. 803(2); *Wright*, 497 U.S. at 820 ("[S]uch statements are given under circumstances that eliminate the possibility of fabrication, coaching, or confabulation, and ... therefore the circumstances surrounding the making of the statement provide sufficient assurance that ... cross-examination would be superfluous."), or lack of motivation to falsify, e.g., "statements made under belief of impending death," *see* M.R. Evid. 804(b)(2); *Mattox v. United States*, 156 U.S. 237, 244, 15 S.Ct. 337, 39 L.Ed. 409 (1895) ("[T]he sense of impending death is presumed to remove all temptation to falsehood, and to enforce as strict an adherence to the truth as would the obligation of oath.").

[¶ 35] The underlying premise for the statements against interest exception is that a "person is unlikely to fabricate a statement against his own interest at the time it is made." *Chambers v. Mississippi*, 410 U.S. 284, 299, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973). Unlike "excited utterances" or "statements made under belief of impending death," however, courts are hesitant to deem the entire exception firmly rooted or, by extension, all statements falling within the exception as presumptively reliable because the exception also encompasses statements made to law enforcement authorities when a declarant has incentive to shift blame to exonerate himself or herself. *See Lilly*, 527 U.S. at 126–132.

[¶ 36] Fuller's statements to Phillips fall within the expansive third category of statements against interest enumerated in *Lilly* because they are statements of an alleged accomplice offered by the prosecu-tion to help establish Small's guilt. *Lilly*, 527 U.S. at 127. Fuller's statements are distinguishable from those that the *Lilly* plurality deemed "inherently unreliable," *id.* at 131, however, given the content and the circumstances under which Fuller made them. Most importantly, although not dispositive, Fuller did not make the statements to law enforcement authorities, in response to direct questioning, or in an otherwise coercive environment where opportunity and motive to falsify at Small's expense were present. *See Dutton*, 400 U.S. at 87 (considering admissibility of an accomplice's statements made to a fellow inmate pursuant to a Georgia statute permitting the admission of hearsay statements of a co-conspirator); *cf. Lilly*, 527 U.S. at 137 ("It is highly unlikely that the presumptive unreliability that attaches to accomplices' confessions that shift or spread blame can be effectively rebutted when ... the government is involved in the statements' production ....."). To the contrary, Fuller volunteered the statements to Phillips, his friend at the time, during one of their frequent "drinking and driving" endeavors. Thus, these statements fall within a category the court found admissible in *Lilly*. *Lilly*, 527 U.S. at 147 (Rehnquist, C.J., concurring) (recognizing "statements to fellow prisoners, like confessions to family members or friends, bear sufficient indicia of reliability to be placed before a jury without confrontation of the declarant"); *Shea*, 211 F.3d at 669 (holding statements made to friends or companions, not to the police, and that did not shift blame to the defendant were admissible).

■ [¶ 37] Furthermore, the statements themselves do not indicate that Fuller was attempting to minimize his own culpability in Sonny's murder. *United States v. Matthews*, 20 F.3d 538, 546 (2nd Cir.1994) (upholding admission of statements in which the declarant fully implicated himself in the crime); *cf. Douglas v.*

*Alabama*, 380 U.S. 415, 419, 85 S.Ct. 1074, 13 L.Ed.2d 934 (1965) (holding the admission of a non-testifying accomplice's confession "plainly denied [the defendant] the right of cross-examination secured by the Confrontation Clause" because the confession shifted blame to the defendant). Fuller clearly implicated himself when he told Phillips that he shot and killed a serviceman. Accordingly, we are satisfied that the record demonstrates that Fuller's statements possess sufficient reliability to comport with the Confrontation Clause, *Westmoreland*, 240 F.3d at 626 ("The admission of hearsay statements under the Confrontation Clause is reviewed de novo."), and, therefore, the court did not err when admitting the statements.[14]

The entry is:

Judgments affirmed.

**14.** Small also contends that Fuller's statements were inadmissible pursuant to the principles set forth in *Bruton v. United States*, 391 U.S. 123, 126, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968) (holding the Confrontation Clause precludes the government from introducing, in a joint trial, the confession of a non-testifying co-defendant that expressly implicates the other defendant), because the statements "directly suggest[ed]" that Small hired Fuller to murder Sonny. Even if Small's efforts to extend the holding of *Bruton* to a nonjoint trial were successful, Small's assertion would not be persuasive, because Fuller's statements, standing alone, do not implicate Small. They make no direct reference to her and only become incriminating when viewed with other evidence introduced at trial. *See State v. Craney*, 662 A.2d 899, 903 (Me.1995) (analyzing whether hearsay statements "implicate" the defendant under the "facial implication doctrine," which holds that a confession is admissible provided the statement, standing alone, does not connect the co-defendants to the crime).