2004 ME 90

**STATE of Maine**

**v.**

**Jeffery GORMAN.**

Supreme Judicial Court of Maine.

Argued: Feb. 13, 2004.
Reargued: June 8, 2004.
Decided: July 22, 2004.

G. Steven Rowe, Attorney General, Donald W. Macomber, Asst. Attorney General (orally), Fernand LaRochelle, Asst. Attorney General, Augusta, for State.

Christopher K. MacLean (orally), MacLean & MacLean, L.L.C., Camden, for defendant.

Panel: SAUFLEY, C.J., and CLIFFORD, RUDMAN, DANA, ALEXANDER, CALKINS, and LEVY, JJ.

ALEXANDER, J.

[¶ 1] Jeffery Gorman appeals from the judgment of conviction for murder entered after a jury trial in the Superior Court (Cumberland County, *Mills, C.J.*). The jury found him guilty of intentionally or knowingly causing the death of Amy St.

Laurent pursuant to 17–A M.R.S.A. § 201(1)(A) (1983).[1] During the grand jury proceedings leading to Gorman's indictment, Gorman's mother testified that Gorman had confessed to her, and she related the details of that confession. At trial, Gorman's mother testified that she had no memory of either the confession or the grand jury proceedings. Gorman asserts that the trial court erred in (1) requiring his mother to testify at trial after she asserted no memory of the events, and (2) admitting at trial his mother's grand jury testimony pursuant to the "recorded recollection" exception to the hearsay rule, M.R. Evid. 803(5). Gorman also asserts that the evidence is insufficient to support his conviction. Because we conclude that there was no error in the trial court's evidentiary rulings and the evidence is sufficient to support the conviction, we affirm the judgment.

## I. CASE HISTORY

[¶ 2] On the evening of October 20–21, 2001, Amy St. Laurent and a friend visited several bars in Portland's Old Port section. During the evening, St. Laurent met Jeffery Gorman and a friend of Gorman's. After St. Laurent and her friend became separated, she accompanied Gorman and his friend to another bar and then to a Portland apartment where Gorman was staying with four other individuals. After approximately one-half hour, St. Laurent asked to be taken back to an Old Port bar to look for her friend. Gorman offered to give St. Laurent a ride, and they left the apartment between 2:00 and 2:30 A.M.

[¶ 3] St. Laurent was last seen alive when she left the apartment with Gorman. Later, in the early morning hours, Gorman, driving alone, was stopped by a Westbrook police officer for driving with his high beams on. At the time, Gorman was driving towards Portland. The time of the stop was 3:14 A.M., and Gorman was allowed to proceed towards Portland at 3:22 A.M.[2]

[¶ 4] After St. Laurent was reported missing, a flyer asking for information about her was distributed in the Portland area. On the evening of October 22, the man who was with St. Laurent on October 20, saw a flyer, contacted police and told them what had happened on late Saturday evening and early Sunday morning.

[¶ 5] Gorman and his friends also saw a flyer and called police. Gorman and two friends were then interviewed separately. Gorman told police that he met St. Laurent in the Old Port, had taken her back to the apartment "looking to score," driven her back to a bar in the Old Port where he dropped her off to look for her friend and then returned to the apartment. In the interview, Gorman did not mention his contact with the Westbrook police, and he refused a police request to search his vehicle.

[¶ 6] The next day, Gorman drove his vehicle to the auto sales business where he and his mother's boyfriend worked. He arrived fifteen minutes before closing time and started cleaning the inside of his car. Gorman told his mother's boyfriend that a friend was borrowing the car the next day. He told another coworker that he had to

1. The murder statute was amended by P.L. 2001, ch. 383, § 8, with the amendment effective January 31, 2003. The current version appears at 17–A M.R.S.A. § 201(1)(A) (Supp. 2003).

2. In interviews with police shortly after St. Laurent's disappearance, two of Gorman's friends claimed that he had returned to the apartment approximately twenty minutes after he left with St. Laurent. They both testified at trial that they may have confused this night and another night.

clean the car because he had a date that night. He also told this coworker that he "may be implicated" in St. Laurent's disappearance, but he had nothing to do with it.

[¶ 7] In November 2001, Gorman told a friend that he had no role in St. Laurent's disappearance. He then stated "They're not going to find her body, they don't have any evidence."

[¶ 8] Before St. Laurent's body was found, Gorman had two telephone conversations with a former girlfriend. In the first, the day after St. Laurent's disappearance, Gorman told his former girlfriend about meeting St. Laurent, and that after bringing her to the apartment, he had dropped her off downtown. He had heard that she was missing and said it was a "weird coincidence." In the next phone call, Gorman told his former girlfriend he had not dropped St. Laurent off as he originally said, but that his two friends had taken her. He stated that when his friends returned after three hours, they had blood on their hands. Gorman further stated that his friends had threatened him to keep him quiet, and made him go to the police. Gorman called his former girlfriend a third time after the body was discovered. He told her that a couple of days after the murder, his friends had asked him for a good spot to hide St. Laurent's body. Gorman said he told them about the place in the woods behind his mother's house near a pond where he had done some fishing.

[¶ 9] St. Laurent's body was found on December 8, 2001, buried in a wooded area three-tenths of a mile from Gorman's mother's house near the pond where Gorman had fished. The cause of death, not disclosed until March of 2002, was a gunshot wound to the head. There was no evidence, other than the position of her clothing, of sexual assault. The body had been exposed for at least twelve to twenty-four hours before it was buried.

[¶ 10] The police received information that Gorman had admitted to his mother that he had shot St. Laurent near the pond. Gorman's mother was then subpoenaed to appear before a grand jury.

[¶ 11] After first refusing to testify and then being ordered by a judge to do so, Gorman's mother testified at the grand jury proceedings on February 8, 2002. Discussing her reluctance to testify, Gorman's mother told the grand jury: "I've always wanted to tell the truth. I just never wanted to talk. I just wanted the justice system to do their job and let justice be served and leave me out of it. Because I certainly don't want to testify in any trial."

[¶ 12] Addressing her conversation with Gorman, his mother testified under oath that Gorman had called her cell phone on December 9, 2001, the day after St. Laurent's body was discovered. She further testified that during that phone call, Gorman first told her that two other men had killed St. Laurent and buried the body near her house in order to implicate him. He then changed his story, and told her that he had killed St. Laurent. Gorman's mother further testified that Gorman said he had taken four hits of acid that night; that while he and St. Laurent were walking by the pond, he had looked at St. Laurent, seen his mother's face, pulled out a gun and shot St. Laurent in the head, intending to kill his mother. He told his mother that he returned three days later and buried the body with a shovel he had borrowed from her.

[¶ 13] Gorman was indicted and pleaded not guilty. His jury trial began in Superior Court on January 13, 2003. That same day, Gorman's mother filed a motion to quash the State's subpoena for her to testify and a supporting affidavit claiming a

complete lack of memory of Gorman's confession or her grand jury testimony. After voir dire on the issue of competency and careful consideration of the issue with counsel, the trial court denied the motion to quash.

[¶ 14] When Gorman's mother took the stand,[3] she testified about conversations she had with Gorman both before and after December 8–9, 2001, including a conversation on December 10 or 11 that resulted in her sending him money. She also testified that before discovery of the body, Gorman had told her that after a party that "never really developed" he had dropped St. Laurent off at a Portland nightclub, and she testified that Gorman had never changed this version of his actions on the night that St. Laurent disappeared.

[¶ 15] Gorman's mother also testified about her recollection of police interviews with her before discovery of the body, about events on December 8 when the body was discovered and about her medical condition at the time of the grand jury proceedings. While recalling and testifying about events on December 8 and December 10, Gorman's mother testified that she had no recollection of her son's December 9 conversation with her or of the grand jury proceedings. The State repeatedly attempted to refresh her recollection, without success, with both the transcript and the audiotape of the grand jury testimony. During this examination, the State asked: "If you testified before the Grand Jury under oath on February 8, 2002 and you took an oath did you testify to the truth?" Gorman's mother responded: "Absolutely."

[¶ 16] Thereafter, the court reporter who had been present at the grand jury testified to lay the foundation for admission of the grand jury testimony. The court reporter identified Gorman's mother as having given testimony on February 8, 2002; he testified that he took down her testimony with his transcription machine and he tape-recorded her testimony. He then transcribed the testimony from his stenographic notes and compared it with the tape-recorded testimony. He testified that the transcript and the audiotape were accurate representations of her testimony that day. He further testified that he observed Gorman's mother being administered the oath to tell the truth and being reminded that she remained under oath on February 8, 2002. Both the audiotape and stenographic notes reflect that she was given that oath.

[¶ 17] After hearing each side fully and over Gorman's objection, the trial court admitted the grand jury testimony pursuant to the past recollection recorded exception to the hearsay rule, M.R. Evid. 803(5). Because concerns had been raised about the accuracy of the grand jury transcript, the trial court allowed the State to play for the jury a redacted audiotape of the testimony, rather than read the transcript.

[¶ 18] Gorman's mother's testimony took place over defense counsel's objection that she was impaired as a result of overmedication with prescription drugs. Gorman's mother testified that she had a history of delusional behavior and was on psychiatric medications at the time of the phone call, that she was experiencing instances of paranoia and psychosis around that time, and that she had had a tumultuous relationship with her son that included a behavior pattern where they would deliber-

---

**3.** Gorman's mother testified before the jury twice, once when called by the State, and once when called by the defense.

ately say hurtful things to each other that often were not true.

[¶ 19] After a five-day trial, the jury returned a verdict of guilty of murder. The trial court later sentenced Gorman to a sixty-year term of imprisonment. Gorman filed this appeal. The Sentence Review Panel denied Gorman's application for leave to appeal his sentence. *State v. Gorman*, No. SRP–03–447 (Me.Sent.Rev.Panel, Oct. 1, 2003).

## II. LEGAL ANALYSIS

### A. Competence to Testify

[¶ 20] Gorman first challenges the court's finding that his mother was competent to testify in light of her professed lack of memory of the critical events and her asserted mental conditions around the time of the phone call and the later grand jury appearance. Gorman argues that the court should have exercised its authority under M.R. Evid. 104(a) [4] to decide the competence question and exclude the witness, rather than leave the issue to be evaluated by the jury as a question of credibility.

[¶ 21] Rule 601, which governs the competency of witnesses, provides:

(a) General rule of competency. Every person is competent to be a witness except as otherwise provided in these rules.

(b) Disqualification of witness. A person is disqualified to be a witness if the court finds that (1) the proposed witness is incapable of communicating concerning the matter so as to be understood by the judge and jury either directly or through interpretation by one who can understand the proposed witness, (2) the proposed witness is incapable of understanding the duty of a wit-

ness to tell the truth, (3) the proposed witness lacked any reasonable ability to perceive the matter or (4) *the proposed witness lacks any reasonable ability to remember the matter.* An interpreter is subject to all the provisions of these rules relating to witnesses.

M.R. Evid. 601 (emphasis added). The advisory committee note to the 1990 amendment to M.R. Evid. 601, which added subsections (b)(3) and (4), provides, in part:

Certainly perception and memory are vital to a witness's ability to bear testimony. These abilities or lack of them are often the subject matter of attacks on witness credibility. The rule as amended will screen out a witness who had no reasonable ability to perceive facts and reliably remember them. It is not intended to permit the trial judge to rule on the credibility of a witness in advance by not permitting the witness to testify.

Field & Murray, *Maine Evidence* 242 (2000 ed.).

[¶ 22] *Maine Evidence* states that: "The inclusion of the phraseology 'any reasonable ability' is intended to make it clear that even a limited ability to perceive and remember may be sufficient to avoid disqualification under amended Rule 601(b)." Field & Murray, *Maine Evidence* § 601.2 at 244 (2000 ed.).

[¶ 23] By affidavit and in testimony, even after numerous attempts to refresh her recollection with both the grand jury transcript and the audiotape of her testimony, Gorman's mother consistently denied any memory of her son's confession to her or of the grand jury proceedings. Gorman's mother also testified that she did

---

**4.** Rule 104(a) directs that "[p]reliminary questions concerning the qualification of a person to be a witness ... shall be determined by the court ...." M.R. Evid. 104(a).

not think she was having problems remembering other events in her life, and she was able to recount details of her daily life including events on December 8 and 10, 2001. She further testified that since her son had been implicated, she has been diagnosed with post-traumatic stress syndrome, she was taking psychiatric medications, and her health had declined considerably.

[¶ 24] The competency of a witness pursuant to M.R. Evid. 601 is a fact question that we review for clear error. *State v. Ellis,* 669 A.2d 752, 753 (Me.1996); *State v. Mazerolle,* 614 A.2d 68, 71 (Me. 1992). A witness's impairment at the time of the events at issue or at the time of giving testimony does not require exclusion of the witness or the testimony. *See State v. McKenna,* 1998 ME 49, ¶¶ 1–4, 707 A.2d 1309, 1309–10. Likewise, a witness's claim of lack of memory of critical events does not require disqualification of the witness. Were the rule applied as Gorman asserts it should be, there would be considerable incentive for a reluctant witness to avoid testifying by feigning lack of memory of critical events.

[¶ 25] After the trial court has determined that a witness is qualified to testify, questions of accuracy of the witness's memory, credibility of the witness's claims of lack of memory, and impact of witness impairment at the time of events or at the time of any testimony are best left to the jury to resolve, considering all the circumstances presented in the trial. The trial court's finding that Gorman's mother had sufficient memory of the matter and was otherwise competent to testify is supported in the record and is not clearly erroneous. Because she testified to some memory of the murder investigation, and had no problem remembering other events that happened at the relevant time, the trial court properly allowed the jury to

assess the credibility and significance of the testimony.

### B. Admitting the Grand Jury Testimony

#### 1. Past Recollection Recorded

[¶ 26] The audiotape of Gorman's mother's grand jury testimony was admitted pursuant to M.R. Evid. 803(5), the exception to the hearsay rule for past-recorded recollection. Rule 803(5) provides:

> The following are not excluded by the hearsay rule, even though the declarant is available as a witness:
>
> . . . .
>
> (5) Recorded Recollection. A memorandum or record concerning a matter about which a witness once had knowledge but now has insufficient recollection to enable the witness to testify fully and accurately, shown to have been made or adopted by the witness when the matter was fresh in the witness's memory and to reflect that knowledge correctly. If admissible, the memorandum or record may be read into evidence but shall not be received as an exhibit unless offered by an adverse party.

[¶ 27] Pursuant to M.R. Evid. 803(5), a document or a recorded statement may be admitted as substantive evidence if the proponent of the statement demonstrates that: (1) the contents of the document or recording are a record of matters previously known to, and remembered by, the witness; (2) the record had been previously made, or adopted, by the witness, at a time when memory of the matters was then fresh; (3) at that past time, the record was remembered by the witness to be an accurate record of the matters described; and (4) the witness presently has no memory or insufficient memory of the subject matter of the statement. *State v. Discher,* 597 A.2d 1336,

1341 (Me.1991); *Cope v. Sevigny,* 289 A.2d 682, 687–88 (Me.1972).

[¶ 28] In *Cope,* we suggested that these criteria would be established by statements from the witness "as his present memory." *Cope,* 289 A.2d at 687. In *Discher,* we qualified this suggestion from *Cope,* and we held that the criteria could be established by direct or circumstantial evidence, independent of the forgetful declarant appearing and testifying as to present memory. *Discher,* 597 A.2d at 1342. We stated that while we had anticipated one scenario in *Cope:*

> Sometimes, however, a witness may be unable or unwilling to testify from present memory. Further inquiry into the ability of the witness to recall the event in question could be time-consuming and unproductive. At such times, it is within the discretion of the trial court to determine whether the foundational requirements of Rule 803(5) have been satisfied on a case-by-case basis, whether by direct or circumstantial evidence.

*Id.* (citations omitted).

[¶ 29] Accordingly, the criteria for admission of past recollection recorded may be established independent of the declarant's testimony as to present memory. "The trial court has considerable discretion as to the method used to comply with the rule, and its determination as to whether the foundational requirements have been sufficiently met will be deferentially reviewed." *Boehmer v. LeBoeuf,* 650 A.2d 1336, 1340 (Me.1994). *See also State v. Robinson,* 656 A.2d 744, 746–47 (Me.1995).

[¶ 30] Rule 803(5) was modeled on the federal rule. *See Discher,* 597 A.2d at 1341. The advisory committee note to Fed. R. Evid. 803(5), states that "[n]o attempt is made in the exception to spell out the method of establishing the initial knowledge or the contemporaneity and accuracy of the record, leaving them to be dealt with as the circumstances of the particular case might indicate." Fed. R. Evid. 803 advisory committee's note.

[¶ 31] Grand jury testimony has been admitted under the federal recorded recollection exception to the hearsay rule. *See United States v. Patterson,* 678 F.2d 774, 777–80 (9th Cir.1982) (admitting grand jury transcript after foundation established by declarant with present memory of having given grand jury testimony and that he believed he had not lied to the grand jury); *United States v. Barrow,* 363 F.2d 62, 67 (3rd Cir.1966) (explaining, generally, that admission of grand jury testimony as recorded recollection is a proper use of such testimony).

[¶ 32] In this case, there is no dispute that the State established that Gorman's mother had "insufficient recollection to enable [her] to testify fully and accurately." M.R. Evid. 803(5). Gorman contends that the State did not establish the remaining criteria for admission of the grand jury testimony. We address those criteria in turn.

[¶ 33] *Was the grand jury testimony made or adopted at a time when the witness's memory of the matters was fresh?* Gorman's mother testified before the grand jury that her son confessed to her on December 9, 2001. The grand jury testimony was presented February 8, 2002. Gorman contends the two-month lapse in time was too long to conclude that the statements were made while fresh in the witness's mind. The two-month period of time is significantly shorter than that found acceptable in other cases. *United States v. Smith,* 197 F.3d 225, 231 (6th Cir.1999) (15 months); *Patterson,* 678 F.2d at 778–80 (10 months). The trial court could reasonably conclude that in those two months a mother would not forget or

confuse her son's confession to her that he had killed another human being.

[¶ 34] Gorman also argues that the quality of the memory should be considered because his mother's illness and the medication she was taking may have substantially impaired her ability to perceive reality and convey her perceptions in a reliable manner. However, the trial court did not exceed the bounds of its discretion in determining that the testimony was given while Gorman's mother's memory of the events was sufficiently fresh, and that the issue of impairment at the time of the grand jury testimony was a question of credibility for the jury.

[¶ 35] *Was the tape of the grand jury testimony a record of matters previously known to and remembered by the witness?*

[¶ 36] *Was the grand jury testimony remembered by the witness to be accurate at the time it was presented?* The State could not establish either of these elements directly, from the witness's present memory. Therefore, it had to establish them with circumstantial evidence. *See Robinson,* 656 A.2d at 746–47; *Discher,* 597 A.2d at 1342. The State did establish that the grand jury testimony was given under oath. Through the court reporter, it identified Gorman's mother as the person who gave the testimony, and established that the transcript and the audiotape accurately recorded her testimony.

[¶ 37] At trial, when asked by the State "if you testified before the Grand Jury under oath on February 8, 2002, and you took an oath did you testify to the truth?" Gorman's mother responded "Absolutely." During her grand jury testimony she stated that "I've always wanted to tell the truth. I just never wanted to talk." She further stated that her testimony about the telephone conversation with her son was "almost word for word." She stated twice that she would "never forget it."

She also testified to the grand jury, "I just wanted the justice system to do their job and let justice be served and leave me out of it. Because I certainly don't want to testify at any trial[,]"and that "you may think I'm a terrible person by not coming forward with this sooner. But I knew good and well my son would pay for what he did. I just didn't want to be the one."

[¶ 38] The trial court concluded that this evidence established the witness's prior knowledge of the contents of her testimony, and that the tape of the grand jury testimony was an accurate record of that knowledge. The trial court also found the following:

> [T]here is a very limited likelihood, based not only on what [the witness] said today, but also the fact that she testified under the pains and penalties, as they say, of perjury to the Grand Jury, I find it very unlikely that she would have lied and I'll take notice of her current motive she may have to forget statements that she made earlier that would be incriminating to her son.

[¶ 39] The trial court, in its ruling, relied in part on the content of the grand jury testimony, and it relied on the fact that the testimony was given under oath and was independently established to be accurate by the court reporter. In addition, the trial court relied on other factors authorized by our case law to establish sufficient reliability through circumstantial evidence: (1) the fact that the witness was unable or unwilling to testify from present memory; (2) the witness's close relationship with the defendant, which, the trial court found, may have been the reason for her memory loss or reluctance to testify; and (3) the witness's trial testimony that if she testified before the grand jury, she testified truthfully.

[¶ 40] The trial court did not exceed the bounds of its discretion in concluding that the grand jury testimony had sufficient indicia of accuracy when presented and that the declarant had then-present knowledge of the facts about which she testified for the grand jury testimony to be admitted under M.R. Evid. 803(5).

2. Prior Inconsistent, Under Oath Statement

 [¶ 41] The rule of evidence regarding admission of prior inconsistent, under oath statements, M.R. Evid. 801(d)(1)(A), was not addressed at trial in relation to the grand jury testimony. The Rule 801(d)(1)(A) issue was not generated until Gorman's mother testified before the jury. We address Rule 801(d)(1)(A) here because, even if the Rule 803(5) ruling was in error, which it was not, admission of the grand jury testimony was appropriate under a different rule than the one addressed at trial. Thus, any error would be harmless. *See State v. White*, 2002 ME 122, ¶ 16, 804 A.2d 1146, 1150. A trial court action, proper under the law, may be affirmed, even if for a reason different than that given by the trial court. *State v. Gwinn*, 390 A.2d 479, 481–83 (Me.1978), 2 Cluchey & Seitzinger, *Maine Criminal Practice* § 52.3 at IX–131 (1995 ed.).

[¶ 42] Rule 801(d)(1)(A) provides, in pertinent part that:

(d) Statements which are not hearsay. A statement is not hearsay if:

(1) Prior statement by witness. The declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is (A) inconsistent with the witness's testimony, and was given under oath subject to the penalty of perjury at a trial, hearing or other proceeding, or in a deposition.

 [¶ 43] We have interpreted M.R. Evid. 801(d)(1)(A) to allow admission, as substantive evidence, of a prior inconsistent statement, given under oath, of a witness who testifies at trial. *State v. Creamer*, 379 A.2d 733, 734 (Me.1977). Such a statement is not hearsay. *Id. See also* Field & Murray, *Maine Evidence* § 801.4 at 401 (2000 ed.).

 [¶ 44] During the trial, Gorman's mother testified before the jury in response to the State's questions, as follows:

Q. I am asking you prior to the discovery of Ms. St. Laurent's body, did your son tell you what he had done that Saturday night that Ms. St. Laurent had disappeared?

A. He told me that he dropped her off at the [Portland night club], I believe is how you say it. He told me that they— that there was a party and it never really developed and that he had dropped her off.

Q. Now—

A. I am sorry, I'm a little nervous and after yesterday's media, I couldn't sleep last night so I am sorry.

Q. Did what he tell you change at all?

A. No, sir.

Q. It never changed?

A. No, sir.

Q. Had you ever testified that his story to you kept changing?

A. No, sir.

Q. You're sure of that?

A. I don't know. I don't remember.

[¶ 45] Gorman's mother's trial testimony as to what Gorman had said about his encounter with St. Laurent, that he never changed this statement, and that she had not testified that Gorman's statement to her kept changing were statements that were inconsistent with her under oath grand jury testimony. Those inconsisten-

cies made the grand jury testimony admissible as substantive evidence pursuant to M.R. Evid. 801(d)(1)(A). *United States v. Young,* 316 F.3d 649, 659–60 (7th Cir.2002) (affirming admission of grand jury testimony as prior inconsistent statements under FED. R. EVID. 801(d)(1)(A); *United States v. Russell,* 712 F.2d 1256, 1258 (8th Cir.1983)) (holding grand jury testimony admissible as substantive evidence under FED. R. EVID. 801(d)(1)(A) when a witness could not recall substance of grand jury testimony).

### 3. The Confrontation Clause

[¶ 46] Gorman contends that the admission of his mother's grand jury testimony, even if proper pursuant to M.R. Evid. 803(5), or M.R. Evid. 801(d)(1)(A), violated his right to confront the witness against him under the Sixth Amendment to the United States Constitution and Article I, Section 6 of the Maine Constitution. We have recognized that statements admissible under an exception to the hearsay rule may be inadmissible when tested against the Confrontation Clause of the United States Constitution because Confrontation Clause analysis differs from hearsay rule analysis. *See State v. Small,* 2003 ME 107, ¶ 22, 830 A.2d 423, 428.

[¶ 47] Applying this difference in analysis, the United States Supreme Court recently held that the Confrontation Clause barred admission of a statement that qualified for admission as a statement against penal interest under a Washington State Court rule similar to M.R. Evid. 804(b)(3). *Crawford v. Washington,* 541 U.S. ——, 124 S.Ct. 1354, 1374, 158 L.Ed.2d 177 (2004). The *Crawford* opinion extensively reviews the history of the Confrontation Clause and its relationship to the hearsay rule. Most significantly, it explicitly overrules *Ohio v. Roberts,* 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980), and the

analytical framework which *Roberts* had supplied to address questions of admissibility of hearsay under the Confrontation Clause over the past two decades. Thus, the Court observed:

Although the results of our decisions have generally been faithful to the original meaning of the Confrontation Clause, the same cannot be said of our rationales. *Roberts* conditions the admissibility of all hearsay evidence on whether it falls under a "firmly rooted hearsay exception" or bears "particularized guarantees of trustworthiness." 448 U.S., at 66, 100 S.Ct. 2531. This test departs from the historical principles identified above in two respects. First, it is too broad: It applies the same mode of analysis whether or not the hearsay consists of *ex parte* testimony. This often results in close constitutional scrutiny in cases that are far removed from the core concerns of the Clause. At the same time, however, the test is too narrow: It admits statements that *do* consist of *ex parte* testimony upon a mere finding of reliability. This malleable standard often fails to protect against paradigmatic confrontation violations.

*Crawford,* 124 S.Ct. at 1369.

[¶ 48] After discussing some judicial and academic criticism of *Roberts,* the Court continued:

Where testimonial statements are involved, we do not think the Framers meant to leave the Sixth Amendment's protection to the vagaries of the rules of evidence, much less to amorphous notions of "reliability." Certainly none of the authorities discussed above acknowledges any general reliability exception to the common-law rule. Admitting statements deemed reliable by a judge is fundamentally at odds with the right of confrontation. To be sure, the Clause's

ultimate goal is to ensure reliability of evidence, but it is a procedural rather than a substantive guarantee. It commands, not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination. The Clause thus reflects a judgment, not only about the desirability of reliable evidence (a point on which there could be little dissent), but about how reliability can best be determined. Cf. 3 Blackstone, Commentaries, at 373 ("This open examination of witnesses ... is much more conducive to the clearing up of truth"); M. Hale, History and Analysis of the Common Law of England 258 (1713) (adversarial testing "beats and bolts out the Truth much better").

The *Roberts* test allows a jury to hear evidence, untested by the adversary process, based on a mere judicial determination of reliability. It thus replaces the constitutionally prescribed method of assessing reliability with a wholly foreign one.

*Id.* at 1370.

[¶ 49] Justice Scalia, writing for the Court, looked to the "original meaning" of the Confrontation Clause in common law practice at the time of adoption of the Bill of Rights. *Id.* at 1365. "As the English authorities above reveal, the common law in 1791 conditioned admissibility of an absent witness's examination on unavailability and a prior opportunity to cross-examine. The Sixth Amendment therefore incorporates those limitations." *Id.* at 1365–66.

[¶ 50] With this history, and conceding some exceptions,[5] Justice Scalia's opinion indicates that the United States Supreme Court's Confrontation Clause jurisprudence has adhered to the following principle: "Testimonial[6] statements of witnesses absent from trial have been admitted only where the declarant is unavailable, and only where the defendant has had prior opportunity to cross-examine." *Id.* at 1369.

[¶ 51] For unavailable witnesses, this rule, focusing on prior opportunity for examination, replaces the "firmly rooted" or "particularized guarantees of trustworthiness" tests of *Roberts* when Confrontation Clause questions arise. While the focus of the opinion was the unavailable witness, the Court also addressed the circumstances when a declarant appears for cross-examination. The Court indicated that such an appearance removes any Confrontation Clause constraint on use of prior statements:

Finally, we reiterate that, when the declarant appears for cross-examination at trial, the Confrontation Clause places no constraints at all on the use of his prior testimonial statements. See *California v. Green,* 399 U.S. 149, 162, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970). It is therefore irrelevant that the reliability of some out-of-court statements " 'cannot be replicated, even if the declarant testifies to the same matters in court.' " *Post,* at [1377], (quoting *United States v. Inadi,* 475 U.S. 387, 395, 106 S.Ct. 1121, 89 L.Ed.2d 390 (1986)). The Clause does not bar admission of a statement so long as the declarant is present at trial

---

5. Most notably *White v. Illinois,* 502 U.S. 346, 349–55, 112 S.Ct. 736, 116 L.Ed.2d 848 (1992), which allowed a child victim's statement to an investigating police officer as a spontaneous declaration. *Crawford,* 124 S.Ct. at 1368 n. 8.

6. Because the statement at issue, made to a police investigator was unequivocally "testimonial," like testimony "before a grand jury, or at a former trial," the court left the definition of "testimonial" to another day. *Id.* at 1374.

to defend or explain it. (The Clause also does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted. See *Tennessee v. Street*, 471 U.S. 409, 414, 105 S.Ct. 2078, 85 L.Ed.2d 425 (1985).)

*Id.* at 1369 n. 9.

[¶ 52] Gorman contends that his mother was effectively unavailable for cross-examination because, in addition to her lack of memory, she was, during her grand jury testimony, under the influence of psychiatric medications and had a history of delusional thought that demonstrated an inability to separate fact from fantasy to the extent that, according to Gorman, she was not "even minimally competent to be a witness." Essentially, Gorman seeks to reargue the competence question, addressed earlier, as a Confrontation Clause issue. However, a witness is not constitutionally unavailable for purposes of Confrontation Clause analysis when a witness who appears and testifies is impaired, *see State v. McKenna*, 1998 ME 49, ¶¶ 1–4, 707 A.2d 1309, 1310, or forgetful, *see United States v. Owens*, 484 U.S. 554, 560, 108 S.Ct. 838, 98 L.Ed.2d 951 (1988).

[¶ 53] Gorman's mother's forgetfulness was particularly selective. She remembered and testified about events on December 8 and a conversation with Gorman on December 10 or 11, but she claimed no memory of a conversation with Gorman on December 9. She remembered and testified about the condition of her health at the time of her grand jury testimony and she testified that if she had testified at the grand jury she "absolutely" would have testified truthfully, but she claimed no memory of the grand jury proceedings. She remembered and testified about some statements Gorman made to her about his encounter with St. Laurent, and she claimed that he had not changed those statements.

[¶ 54] In *Owens*, the United States Supreme Court held that even when a witness has no present memory of a prior out-of-court statement, the right of confrontation is satisfied if the accused has the opportunity to cross-examine the witness at trial:

This Court has recognized a partial (and somewhat indeterminate) overlap between the requirements of the traditional hearsay rule and the Confrontation Clause. The dangers associated with hearsay inspired the Court of Appeals in the present case to believe that the Constitution required the testimony to be examined for "indicia of reliability," or "particularized guarantees of trustworthiness." We do not think such an inquiry is called for when a hearsay declarant is present at trial and subject to unrestricted cross-examination. In that situation ... the traditional protections of the oath, cross-examination, and opportunity for the jury to observe the witness' demeanor satisfy the constitutional requirements. We do not think that a constitutional line drawn by the Confrontation Clause falls between a forgetful witness' live testimony that he once believed this defendant to be the perpetrator of the crime, and the introduction of the witness' earlier statement to that effect.

*Id.* (internal citations omitted).

[¶ 55] Thus, the *Crawford* Court observed: "when the declarant appears for cross-examination at trial, the Confrontation Clause places no constraints at all on the use of his prior testimonial statements." *Crawford*, 124 S.Ct. at 1369 n. 9. "[I]t is this literal right to 'confront' the witness at the time of trial that forms the core of the values furthered by the Confrontation Clause[.]" *California v. Green*,

399 U.S. 149, 157, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970).[7] Here, the Confrontation Clause was satisfied when Gorman was given the opportunity to examine and cross-examine his mother before the jury regarding what she did and did not recall and the reasons for her failure of recollection. There was no Confrontation Clause violation in admission of the mother's grand jury testimony.

## C. Sufficiency of the Evidence

■■■ [¶ 56] We review the sufficiency of the evidence "in the light most favorable to the state to determine whether a trier of fact rationally could find beyond a reasonable doubt every element of the offense charged." *State v. Michaud*, 1998 ME 251, ¶ 11, 724 A.2d 1222, 1228 (quoting *State v. Chad B.*, 1998 ME 150, ¶ 11, 715 A.2d 144, 147–48). "A person is guilty of murder if ... [h]e intentionally or knowingly causes the death of another human being." 17–A M.R.S.A. § 201(1)(A) (1983).

■■■ [¶ 57] The record includes the following evidence from which a jury could have rationally concluded, beyond a reasonable doubt, that Gorman intentionally or knowingly caused the death of Amy St. Laurent:

• Gorman was the last person seen with St. Laurent.

• Gorman told a police interviewer that he left St. Laurent at a Portland bar at 1:45 A.M. and watched her go inside. The bar was closed at that time. Other evidence suggested he did not leave the apartment with St. Laurent until 2:00 A.M. or thereafter.

• Gorman told police and his friends that he returned to the Portland apartment immediately after dropping St. Laurent off at the Portland bar. However, he was stopped by a police officer that night in Westbrook from 3:14 A.M. to 3:22 A.M.

• On the Tuesday following St. Laurent's disappearance, Gorman told a police officer that he did not have time to allow him to search Gorman's car. Gorman cleaned his car later that day, telling one coworker he had a date that night, and another that he was letting someone borrow the car the next day.

• In mid-November, Gorman told a friend that he was implicated in St. Laurent's disappearance, but the police did not have any evidence and were not going to find her body.

• In the days after St. Laurent's disappearance, Gorman told an ex-girlfriend that he had lied about dropping St. Laurent off at the Portland bar, that his friends actually dropped her off, and they returned three hours later with blood on their hands. After her body was found, he told his ex-girlfriend that he had told his friends about a good spot to hide St. Laurent's body, in the woods behind his mother's house.

• St. Laurent's body was found buried in the woods three-tenths of a mile from Gorman's mother's house, near a pond in an area familiar to Gorman.

• St. Laurent had been shot in the head.

7. In *Green*, the Court upheld the admission at trial of a witness's preliminary hearing testimony occasioned by the witness's failure to remember his earlier inconsistent out-of-court statement. The Court concluded that the truth-seeking purpose of the Confrontation Clause is achieved if the declarant is present and testifying at trial. Regardless of whether the out-of-court statement was made under oath (as it was here), "the witness must now affirm, deny, or qualify the truth of the prior statement under the penalty of perjury ... [and the] jury may be expected to understand and take into account in deciding which, if either, of the statements represents the truth." *California v. Green*, 399 U.S. 149, 158–59, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970).

• Gorman had been seen with a gun in the weeks before St. Laurent disappeared. Around that time, he also bragged to a girlfriend that he always carried a gun with him.

• A part-time police officer testified that Gorman may have stolen a handgun from him with a caliber similar to that used to shoot St. Laurent.

• One day after St. Laurent's body was found, Gorman confessed to his mother that he shot her in the head. The cause of death was not released to the public until after his mother testified before the grand jury.

[¶ 58] This evidence is sufficient to support the conviction.

The entry is:

Judgment affirmed.